UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-232 (JRT/DTS)

UNITED STATES OF AMERICA,

    Plaintiff,

v.

19. AMONDO ANTOINE MILLER,
31. TASHENA LAVERA CRUMP,
35. BALLAM HAZAKIAH DUDLEY, and
37. MONICA SABINA SHARMA-HANSSEN

**GOVERNMENT'S TRIAL BRIEF**

    Defendants.

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Harry M. Jacobs, Matthew S. Ebert, and Melinda A. Williams, Assistant U.S. Attorneys, respectfully submits this trial brief outlining the evidence the Government intends to present at trial.

**I.   OVERVIEW**

The defendants participated in a nationwide telemarketing fraud scheme. The defendants accomplished their fraud scheme by calling victim-consumers who had one or more existing magazine subscriptions and offering to "renew" the existing magazine subscriptions, often at a reduced cost. In reality, the defendants were not calling to renew or reduce the price of the existing subscriptions. Instead, the defendants tricked their victims into signing up for entirely new magazine subscriptions, which they did not want and often could not afford.

The government charged more than sixty defendants in several indictments with participating, at various levels, in this scheme. All told, these sixty-plus

1

defendants stole at least $300 million from more than 150,000 victims, who were disproportionately elderly and otherwise vulnerable, using this scheme.

Of the defendants charged in the largest of the indictments (*United States v. Russell Rahm, et. al.,* 20-232 (JRT)), defendants Amondo Miller, Tashena Crump, Monica Sharma-Hanssen, and Ballum Dudley remain for trial.  The defendants are charged with multiple counts including conspiracy, mail fraud, and wire fraud.

II.   ANTICIPATED FACTS AT TRIAL

   A.   The Fraud Scheme

The indictment charges that the fraud scheme the defendants participated in had been ongoing since at least 2000.  The scheme involved telemarketing companies located in Minnesota and across the country fraudulently tricking victim-consumers—often the elderly—into paying for expensive and unwanted magazine subscription packages.  The scheme worked like this.

The telemarketing companies used sales scripts containing fraudulent sales pitches designed to trick victim-consumers into unwittingly signing up for expensive magazine subscription packages.  The defendants called victim-consumers who had one or more existing subscriptions for magazines.  The defendants pretended to be calling from the victims' *existing* magazine service about an *existing* subscription.  This was a lie.  The defendants pretended to be calling to check on the status of the magazines, asking if the magazines were coming on time and in good condition.  The defendants then said they had an offer for the victims—an offer to reduce the cost of the existing subscription or renew the subscription at a reduced cost.  This was untrue.  In reality, the defendants were not calling to renew or reduce the price of an

*existing* subscription. Instead, the defendants tricked their victims into signing up for entirely *new* magazine subscriptions. This scheme worked particularly well on the elderly and vulnerable, who were more likely to be confused and deceived by the lie.

The effect was that a single consumer went from having one magazine subscription to, at times, more than a dozen, all with different fraudulent magazine companies, each "sold" under the auspices of "reducing" the consumer's monthly rate. Some of the so-called "mega victims" were being charged by a dozen or more companies a month and were charged more than $50,000 for magazines they did not want or knowingly order. Viewing months and years' worth of victim-consumer credit card statements, the magazine charges grow like a cancer until the charges for a single month looks something like this:




**B.    The Lead Lists**

The defendants and their companies worked together to carry out their scheme. Among other things, they bought, sold, and traded "lead lists" of victim consumers to one another. The lead lists—known as "PDS" or "paid-during-service"

3

leads—contained names and contact information for consumers who had active and ongoing magazine subscriptions. The companies used the information on these lead lists to defraud consumers by fraudulently pretending to be calling from the customers' existing magazine provider to discuss the status of an existing magazine subscription. The PDS leads were critical to the criminal conspiracy. Without this type of lead, the fraud scheme would fail—most consumers could not be tricked into believing they were talking to their magazine company if they had no magazine company.

Some PDS leads had more detailed information, identifying not only the customer's name and contact information, but their address, age, profession, credit card number, and list of magazines to which the customer was subscribed. They contained the names of those consumers—disproportionately elderly and otherwise vulnerable—who would fall for the fraud again and again. As such, the leads were sold at a considerable premium.

During the investigation, the government obtained federal search warrants for the contents of dozens of email accounts used by co-conspirators. The ensuing searches showed that the co-conspirators bought and sold lead lists to and from one another, and through lead brokers, including defendant Amondo Miller.

C. **The Undercover Investigation**

In 2019, law enforcement conducted an undercover investigation into the fraudulent magazine industry. At the direction of law enforcement, a cooperating individual sent lead lists to several lead brokers.

The undercover lead lists mimicked the PDS lead lists. They purported to contain information about a customer who had existing magazine subscriptions, including the customer's name, address, age, profession, credit card number, and a list of magazines to which the customer subscribed. But these leads were different in one key way. Unbeknownst to the lead brokers, the names on these lead lists were not of real people. They were undercover identities attached to federal agents and other law enforcement sources.

Not knowing that the lead sheets were full of undercover federal agents, the lead brokers unwittingly sold the undercover lead lists throughout the criminal conspiracy.

Within days, the undercover agents began receiving calls from magazine companies, attempting to defraud them. The calls were recorded. Undercover agents recognized the callers to be using one of the two types of fraudulent scripts. Some of the callers used the "payment reduction" script that fraudulently induced customers into signing up for a new magazine subscription under the guise of reducing the monthly payments on an existing magazine subscription. Others used the "consolidation" script that fraudulently induced customers into making a large one-time payment to the company in order to consolidate and reduce existing magazine bills. In both cases, the employees were lying to the undercover agents and then charging their credit cards—they were committing fraud.

For example, in July 2019, a lead broker sent 20 of the undercover lead sheets to defendant Timothy Hanssen. Timothy Hanssen and defendant Monica Sharma-

Hanssen own Midwest Publishers Home Office (MPHO), a Minnesota-based magazine sales company. Shortly thereafter, the undercover agents whose identities appeared on the list began receiving calls from employees of MHPO. The undercover agent using the assumed name Rose Cubur received a call from a telemarketer who worked for Sharma-Hanssen. The telemarketer proceeded to defraud Cubur using the same script circulated throughout the magazine industry—and later found during a search warrant at MPHO.

The telemarketer falsely claimed that Rose Cubur was an existing customer of MPHO and offered to reduce her monthly payment from $49.00 a month to $44.90 a month. This was all a lie. Cubur was not a real person. She did not have a magazine subscription with MPHO or any other magazine company, and MPHO had no ability to reduce any payments "owed."

At the end of the call, the sales representative recorded a final portion of the call that, standing alone, made it sound as though Rose Cubur could have intended to sign up for a new magazine subscription. During this recorded portion of the call, the telemarketer had Rose Cubur confirm that she was agreeing to make 20 payments of $44.90, without reference to the earlier conversation about how this was a *reduction* in price on an *existing* account. In doing so, the recorded portion of the call fraudulently and misleadingly made it sound as though Rose Cubur was signing up for a new magazine subscription. Many of the defendants' companies similarly selectively recorded "clean" portions of the fraudulent calls. In contrast, law

6

enforcement recorded the *entirety* of the calls, which reveal that the victim-consumers were in fact being defrauded.

In all, the undercover agents received and recorded hundreds of phone calls from telemarketers using fraudulent sales pitches.

### D.   The Search Warrants

In February 2020, the government obtained federal search warrants for more than twenty companies run by the co-conspirators across the country, including the companies involving the four remaining defendants. During these searches, the government seized fraudulent sales scripts, lead lists (including the undercover lead lists), order and billing information, customer complaints, and financial records.

### E.   The Indictments

On October 20, 2021, a grand jury charged 43 defendants, including the four remaining defendants, with engaging in this fraud scheme. *United States v. Rahm, et al.*, 20-232 (JRT). Additional defendants were charged in related indictments. The vast majority of the defendants in the case have pled guilty. The government expects its evidence at trial will include defendants and others who are cooperating with the government and will testify as to their role in the conspiracy and identify the defendants as others involved in the conspiracy.

## III.   THE DEFENDANTS AND THEIR ROLES

### A.   Defendant Amondo Miller

Amondo Miller was the owner of Magazine Solutions, a Colorado-based telemarketing company involved in fraudulent magazine sales. Miller also served as a lead broker. Through his company—Power Sales & Marketing—Miller supplied

many of the PDS leads to the conspiracy that allowed it to continue to defraud massive numbers of victims.

A number of Miller's former employees and co-conspirators are expected to testify to his role in the fraudulent scheme, both as a company owner and as a lead broker. Among others, former Magazine Solutions telemarketers will testify that Miller's company would call their existing magazine customers and offer—fraudulently—to cancel all current magazine subscriptions for a one-time payment, typically around $159.90. In reality, the employees will testify that this was a lie and that the payment would not cancel the customers' existing subscriptions but instead sign them up for an entirely new, unwanted, subscription. The telemarketing employees later called these same customers again, to defraud them yet again.

The evidence against Miller will include numerous emails with his co-conspirators, search warrant evidence recovered from Miller's company, victim-consumer complaints that were routed to Miller, a financial analysis of his profit (upwards of $1 million), and the fraudulent scripts that were found in Miller's emails as well as at his company.

### B. Defendant Tashena Crump

Defendant Tashena Crump worked as the general manager for several Minnesota-based companies owned by Brian Williams, all of which were involved in fraudulent magazine sales. These companies included Readers Club Home Office (RHCO), Pacific Renewal, and Tropical Readers. While Williams was the owner of the companies, Crump—who went by "Shena" at work—served as the general

manager and at times the de facto owner; Williams was both a drug addict and at times an absentee business owner.

Williams pled guilty for his role in the fraudulent scheme and is expected to testify that Crump had knowledge of and was deeply involved in the fraudulent scheme. Other co-conspirators, including convicted lead brokers, are also expected to testify that Crump routinely bought and sold fraudulent leads dating back years.

The evidence against Crump includes numerous emails with other members of the conspiracy, including emails buying and selling PDS leads, victim-consumer complaints that were routed to Crump, and PS Online records reflecting years that Crump spent as a telemarketer and closer actively engaged in the fraud.

### C. Defendant Monica Sharma-Hanssen

Defendant Monica Sharma-Hanssen owned and operated Midwest Publishers Home Office (MPHO), a Minnesota-based company involved in fraudulent magazine sales. MPHO had a telemarketing call center in St. Louis Park, Minnesota. Sharma-Hanssen previously worked with defendant Brian Williams, the father of her child, committing the fraud. At MPHO, Sharma-Hanssen worked with her then-husband, defendant Tim Hanssen, to carry out the fraud scheme.

MPHO obtained and carried out the fraud scheme on the undercover agents. The evidence at trial will include those recordings. A number of Hanssen's former employees and co-conspirators are expected to testify to her role in the fraudulent scheme as a company owner. During the search of Hanssen's business, the government seized fraudulent sales scripts, lead lists (including the undercover lead lists), order and billing information, and customer complaints routed to Sharma-

Hanssen. The evidence will include emails such as the one below, where Sharma-Hanseen says to "be a bit careful with selling 49.90 and 59.90 to anyone over 70yrs we see chargebacks coming , better safe then sorry… = lower payments over 70yr"



(no subject)
Monica Hanssen <mhanssen12@gmail.com>
To
be a bit careful with selling 49.90 and 59.90 to anyone over 70yrs we see chargebacks coming , better safe then sorry… =lower payments over 70yr

The evidence will also include a financial analysis of Sharma-Hanssen's profit from the fraud (nearly $10 million).

### D. Ballum Dudley

Defendant Ballum Dudley was a magazine telemarketer at Westside Readerz, a company in Fridley, Minnesota, involved in the fraudulent telemarketing scheme. Dudley worked at the company on and off for more than a decade. He was both a telemarketer and a "closer." Dudley worked at the Westside Readerz call center in Fridley, Minnesota, and later worked from his home in Fayetteville, Arkansas. When the undercover leads were sent out to the conspiracy, Dudley was captured on tape defrauding undercover agents on three occasions.

The owner of Westside Readerz, Jared Michelizzi, pled guilty for his role in the fraudulent scheme. Similarly, Dudley's fellow charged telemarketers at Westside Readerz have also pled guilty for their respective roles in the fraud. Michelizzi and others are expected to testify that Dudley had knowledge of and was involved in the fraudulent scheme with them.

The evidence against Dudley will include false statements he made to law enforcement, recorded inculpatory statements he made to Michelizzi, PS Online records documenting years worth of "sales" by Dudley, boxes of old tapes recording Dudley carrying out the "clean" version of the script, and the fraudulent scripts found during the search warrant.

## IV. TRIAL COUNSEL

The United States will be represented at trial by the following Assistant United States Attorneys:

Harry M. Jacobs
300 S. 4th St., Suite 600
Minneapolis, MN  55415
Tel:  612-664-5600
harry.jacobs@usdoj.gov

Matthew S. Ebert
300 S. 4th St., Suite 600
Minneapolis, MN  55415
Tel:  612-664-5600
matthew.ebert@usdoj.gov

Melinda A. Williams
300 S. 4th St., Suite 600
Minneapolis, MN  55415
Tel:  612-664-5600
melinda.williams@usdoj.gov

## V. LENGTH OF TRIAL

The Government anticipates that its case-in-chief will last approximately three weeks.

## VI. MOTIONS IN LIMINE

The Government has filed the following motions in limine:

- Motion to allow agents to be present in the courtroom (Dkt. # 1778)

- Motion to preclude argument that following orders is a defense to criminal charges (Dkt. # 1779)

11

- Motion to preclude references to government's charging decisions (Dkt. # 1780)

- Motion to preclude reference to evidence of defendants' lawful behavior (Dkt. # 1781)

- Motion to preclude reference to possible punishment (Dkt. # 1782)

- Motion to preclude improper defenses (Dkt. # 1783)

- Motion to admit co-conspirator statements (Dkt. # 1784)

- Motion to admit victim-consumer complaints (Dkt. # 1798)

Date: September 18, 2023                    Respectfully submitted,

                                          ANDREW M. LUGER
                                          United States Attorney

BY:   /s/ *Harry M. Jacobs*
      HARRY M. JACOBS
      MATTHEW S. EBERT
      MELINDA A. WILLIAMS
      Assistant U.S. Attorneys