# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

UNITED STATES OF AMERICA,

                      Plaintiff,

v.

AMONDO ANTOINE MILLER,
TASHENA LAVERA CRUMP, &
BALLAM HAZEAKIAH DUDLEY,

                  Defendants.

Criminal No. 20-232 (JRT/DTS)

**THE COURT'S INSTRUCTIONS
TO THE JURY**

_____

## TABLE OF CONTENTS

1. INTRODUCTION ................................................................................ 3
2. GENERAL DUTIES ........................................................................... 4
3. PARTIES .............................................................................................. 5
4. BIAS AND PREJUDICE ..................................................................... 6
5. EVIDENCE AND LIMITATIONS ..................................................... 7
6. COURT'S OPINION .......................................................................... 9
7. JUDGING THE EVIDENCE ............................................................. 10
8. CHARTS AND SUMMARIES .......................................................... 11
9. DEMONSTRATIVE EVIDENCE..................................................... 12
10. CREDIBILITY OF WITNESSES .................................................... 13
11. INCONSISTENT STATEMENTS .................................................... 14
12. WITNESSES WHO HAVE PLED GUILTY ................................... 15
13. COOPERATING WITNESSES ........................................................ 16
14. PRIOR CONVICTIONS OF WITNESSES..................................... 17
15. DRUG AND ALCOHOL ABUSE OF WITNESSES ...................... 18
16. NUMBER OF WITNESSES CALLED ........................................... 19
17. DEFENDANTS' TESTIMONY ........................................................ 20
18. PRESUMPTION OF INNOCENCE, BURDEN OF PROOF ......... 21
19. INDICTMENT NOT EVIDENCE ................................................... 23
20. SUMMARY OF INDICTMENT....................................................... 24

21.   INDICTMENT ................................................................................................ 25

22.   VERDICT AS TO DEFENDANTS ONLY ................................................. 56

23.   APPROXIMATE DATES ............................................................................ 57

24.   PROOF OF INTENT OR KNOWLEDGE ................................................. 58

25.   CONSPIRACY TO COMMIT MAIL FRAUD ........................................... 59

26.   CONSPIRACY ELEMENT ONE ............................................................... 60

27.   CONSPIRACY ELEMENT TWO ............................................................... 61

28.   CONSPIRACY ELEMENT THREE ........................................................... 62

29.   MULTIPLE CONSPIRACIES ..................................................................... 63

30.   TELEMARKETING ...................................................................................... 64

31.   MAIL FRAUD ............................................................................................... 65

32.   MAIL FRAUD ELEMENT ONE ................................................................. 66

33.   MAIL FRAUD ELEMENT TWO ................................................................. 67

34.   MAIL FRAUD ELEMENT THREE ............................................................. 68

35.   TELEMARKETING ...................................................................................... 69

36.   WIRE FRAUD ............................................................................................... 70

37.   WIRE FRAUD ELEMENT ONE ................................................................. 71

38.   WIRE FRAUD ELEMENT TWO ................................................................. 72

39.   WIRE FRAUD ELEMENT THREE ............................................................. 73

40.   TELEMARKETING ...................................................................................... 75

41.   WILLFUL BLINDNESS .............................................................................. 76

42.   GOOD FAITH ............................................................................................... 77

43.   AMONDO MILLER'S THEORY OF DEFENSE ....................................... 78

44.   TASHENA CRUMP'S THEORY OF DEFENSE ....................................... 79

45.   BALLAM DUDLEY'S THEORY OF DEFENSE ....................................... 80

46.   FINAL INSTRUCTIONS ............................................................................. 81

# 1.  INTRODUCTION

The Court will now give you instructions on the law and on your duties as jurors.

Please continue to follow the instructions given to you earlier by the Court.  You must not single out some instructions and ignore others, because *all* are important, whether given to you in writing or not.

Written copies of the instructions the Court is about to give you will be available to you in the jury room.  Please remember that *all* instructions, whenever given and whether in writing or not, must be followed.

## 2.  GENERAL DUTIES

It is your duty as jurors to find from the evidence what the facts are.  You will then apply the law, as given to you in these instructions, to those facts.  You must follow the Court's instructions on the law, even if you thought the law was different or if you think the law should be different.

The lawyers have quite properly referred to some of the applicable rules of law in their closing arguments to you.  However, if any difference appears to you between the law as stated by counsel and the law as stated by the Court in these instructions, you, of course, must follow the instructions given to you by the Court.

Do not allow sympathy or prejudice to influence you.  The law requires a just verdict, unaffected by anything except the evidence, your common sense, and the law as given to you by the Court.

### 3.  PARTIES

Defendants Amondo Antoine Miller, Tashena Lavera Crump, and Ballam Hazeakiah Dudley shall be referred to in these instructions as "the defendants," collectively, or "the defendant," individually.  The United States shall be referred to as "the prosecution" or "the government."

### 4.  BIAS AND PREJUDICE

You must decide the case solely on the evidence and the law before you, without bias or prejudice as to any party. All parties expect that you will carefully and impartially consider all of the evidence, follow the law that is being given to you, and reach a just verdict, regardless of the consequences.

It is important that you discharge your duties as jurors without discrimination.  Bias regarding the race, ethnicity, religious beliefs, national origin, sexual orientation, gender, or gender identity of the plaintiff, defendants, witnesses, and lawyers should play no part in how you exercise your judgment during the trial.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.

You must not be influenced by sympathy, prejudice, public opinion, personal likes or dislikes, or bias, including unconscious or implicit bias.  Unconscious or implicit biases are stereotypes, attitudes, or preferences that you may consciously reject but that may affect your judgment without your conscious awareness, control, or intention.

## 5.  EVIDENCE AND LIMITATIONS

The evidence in this case consists of the testimony of witnesses, the documents and other things received as exhibits.

Please remember also what is not evidence:

1.      Statements, arguments, questions, and comments by lawyers representing the parties in the case are not evidence.

2.      Objections are not evidence.  Lawyers have a right to object when they believe something is improper.  You should not be influenced by the objection.  If the Court sustained an objection to a question, you must ignore the question and not guess what the answer might have been.

3.      Testimony that the Court told you to disregard is not evidence and must not be considered.

4.      Anything you saw or heard about this case outside the courtroom is not evidence.

You are to base your verdict only on the evidence received in the case.  In your consideration of the evidence received, however, you are not limited to the statements of the witness.  In other words, you are not limited solely to what you see and hear as the witnesses testified.  You are permitted to draw from the facts, which you find have been proven, such reasonable inferences as you feel are justified in the light of your experience and common sense.  Inferences are simply deductions or conclusions which reason and common sense lead you to draw from the facts as established by the evidence in the case.

You also should not be concerned with the terms "direct evidence" and "circumstantial evidence." The law makes no distinction between direct and circumstantial evidence. You should give all evidence the weight and value you believe it is entitled to receive.

## 6.  COURT'S OPINION

If any reference by the Court or by counsel to matters of testimony or exhibits does not coincide with your own recollection of that evidence, it is your recollection which should control during your deliberations and not the statements of the Court or counsel.

## 7.  JUDGING THE EVIDENCE

There is nothing particularly different in the way in which a juror should consider the evidence in a trial from the way in which any reasonable and careful person would treat any very important question that must be resolved by examining facts, opinions, and evidence.  You are expected to use your good sense in considering and evaluating the evidence in the case.  You are also expected to give such evidence a reasonable and fair construction in the light of your common knowledge of the natural tendencies and inclinations of human beings.

If a defendant is proven guilty beyond a reasonable doubt, then you should reach that result.  If a defendant is not proven guilty beyond a reasonable doubt, then you should reach that result.

You should also remember that it would be a violation of your sworn duty to base a verdict upon anything other than the evidence received in the case and the instructions of the Court.  Remember that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence, because the burden of proving guilt beyond a reasonable doubt is always placed on the prosecution.

## 8.  CHARTS AND SUMMARIES

You will remember that certain summaries and charts were admitted in evidence. You may use those summaries and charts as evidence, even though the underlying documents and records are not here.  However, the accuracy of some of those summaries and charts has been challenged.  It is for you to decide how much weight, if any, you will give to them. In making that decision, you should consider all of the testimony you heard about the way in which they were prepared.

## 9.  DEMONSTRATIVE EVIDENCE

You have reviewed certain material that has been labeled demonstrative.  This material is not evidence or proof of any facts.  The material was provided to help you understand testimony as it occurred.  If the material does not correctly reflect the facts shown by the evidence in the case, you should disregard this material and determine the facts from the underlying evidence.

## 10. CREDIBILITY OF WITNESSES

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness said, you may believe only part of what a witness said, or you may believe none of what a witness said.

In deciding what testimony to believe, you may consider the witness's intelligence, the opportunity the witness had to see or hear the things testified about, the witness's memory, any motives that witness may have for testifying a certain way, the manner of the witness while testifying, whether that witness said something different at an earlier time, the general reasonableness of the testimony, and the extent to which the testimony is consistent with any evidence that you believe.

In deciding whether or not to believe a witness, keep in mind that people sometimes hear or see things differently and sometimes forget things. You need to consider therefore whether a contradiction is an innocent misrecollection or lapse of memory or whether it is an intentional falsehood. That may depend on whether the contradiction has to do with an important fact or only with a small detail.

## 11. INCONSISTENT STATEMENTS

The testimony of a witness may be discredited or, as we sometimes say, impeached by showing that he or she previously made statements which are different than or inconsistent with his or her testimony here in Court. The earlier inconsistent or contradictory statements are admissible only to discredit or impeach the credibility of the witness and not to establish the truth of these earlier statements made somewhere other than here during this trial. It is the responsibility of the jury to determine the credibility, if any, to be given the testimony of a witness who has made prior inconsistent or contradictory statements.

If a person is shown to have knowingly testified falsely concerning any important or material matter, you obviously have a right to distrust the testimony of such an individual concerning other matters. You may reject all of the testimony of that witness or you may give it such weight or credibility as you may think it deserves.

## 12. WITNESSES WHO HAVE PLED GUILTY

You have heard that the witnesses Wayne Robert Dahl, Eric McGarrity, Daniel Klibanoff, James Sierra, Jared Michelizzi, and Andrew Landsem pleaded guilty to crimes which arose out of the same events for which the defendants are on trial here. You must not consider those guilty pleas as any evidence of these defendants' guilt. You may consider those witness' guilty pleas only for the purpose of determining how much, if at all, to rely upon their testimony.

The testimony of Wayne Robert Dahl, Eric McGarrity, Daniel Klibanoff, James Sierra, Jared Michelizzi, and Andrew Landsem was received in evidence and may be considered by you. You may give their testimony such weight as you think it deserves. Whether or not their testimony may have been influenced by their desire to please the government or strike a good bargain with the government about their own situation is for you to determine.

## 13. COOPERATING WITNESSES

You have heard evidence that the witnesses Wayne Robert Dahl, Daniel Klibanoff, James Sierra, Jared Michelizzi, and Andrew Landsem hope to receive reduced sentences on criminal charges pending against them in return for their cooperation with the government in this case. These witnesses entered into agreements with the government which provides, among other things, an agreement that the government will recommend less severe sentences than the witnesses faced had they not cooperated.

You may give the testimony of these witnesses such weight as you think it deserves. Whether or not testimony of a witness may have been influenced by their hope of receiving a reduced sentence is for you to decide.

## 14. PRIOR CONVICTIONS OF WITNESSES

You have heard that the witnesses Wayne Robert Dahl, Eric McGarrity, Daniel Klibanoff, Macario Aguilar, Jr., and Andrew Landsem were once convicted of various crimes. You may use that evidence only to help you decide whether to believe the witnesses and how much weight to give their testimony.

It is the sole and exclusive right of the jury to determine the weight to be given to any prior conviction as impeachment and the weight to be given to the testimony of anyone who has previously been convicted of a felony.

## 15. DRUG AND ALCOHOL ABUSE OF WITNESSES

The testimony of a drug or alcohol abuser must be examined and weighed by the jury with greater care than the testimony of a witness who does not abuse drugs or alcohol.  The jury must determine whether the testimony of the drug or alcohol abuser has been affected by drug or alcohol use or the need for drugs or alcohol.

## 16. NUMBER OF WITNESSES CALLED

Your decision on the facts of this case should not be determined by the number of witnesses testifying for or against a party. You should consider all the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not believe. You may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other side.

## 17. DEFENDANTS' TESTIMONY

You have heard evidence that a defendant was previously convicted of various crimes. You may use that evidence only to help you decide whether to believe his testimony and how much weight to give it. The fact that he was previously convicted of a crime does not mean that he committed the crimes charged here, and you must not use that evidence as proof of his guilt of the crimes charged in this case.

A defendant in a criminal case has an absolute right under the United States Constitution not to testify.

The fact that a defendant did not testify must not be discussed or considered by the jury in any way when deliberating and in arriving at your verdict. No inference of any kind may be drawn from the fact that a defendant decided to exercise his privilege under the Constitution and did not testify.

## 18. PRESUMPTION OF INNOCENCE, BURDEN OF PROOF

The Court instructs you that you as jurors must presume the defendants to be innocent of the crime charged. Thus, the defendants, although accused of a crime in the indictment, began the trial with a clean slate—with no evidence against them. The indictment, as you already know, is not evidence of any kind. The defendants are not on trial for any act or crime not contained in the indictment. The law permits nothing but the evidence presented before the jury in court to be considered in support of any charge against the defendants. The presumption of innocence alone is sufficient to acquit the defendants.

The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to the defendants for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. The defendants are not even obligated to produce any evidence by cross-examining the witnesses for the prosecution.

It is not required that the prosecution prove guilt beyond all possible doubt. The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense, and not mere speculation. A reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs.

Unless the prosecution proves, beyond a reasonable doubt, that the defendants have committed each and every element of the offenses charged in the indictment, you must find

the defendants not guilty of the offenses.  If the jury unanimously views the evidence in the case as reasonably permitting either of two conclusions—one of not guilty, the other of guilty—the jury must adopt the conclusion of not guilty.

## 19. INDICTMENT NOT EVIDENCE

The next two instructions summarize the charges against the defendants and provide you with the indictment.  You should remember that an indictment is simply an accusation.  It is not evidence of anything.  This summary of the charges is also not evidence.  The defendants, even though charged, began this trial with no evidence against them.  The defendants have pleaded not guilty to the charges in the indictment, and must be presumed innocent, unless and until proven guilty beyond a reasonable doubt.  There is no burden upon a defendant to prove that they are innocent.  The presumption of innocence alone is sufficient to find the defendants not guilty and can be overcome only if the prosecution proves, beyond a reasonable doubt, each essential element of a crime charged.

## 20. SUMMARY OF INDICTMENT

The indictment in this case charges the defendants with three crimes.

Under Count 1, the indictment charges each defendant committed the crime of conspiracy to commit mail fraud.

Under Counts 11, 15, 18, and 26, the indictment charges the defendant AMONDO MILLER committed the crime of wire fraud.

Under Counts 36, 40, and 47, the indictment charges the defendant TASHENA CRUMP committed the crime of wire fraud.

Under Count 6, the indictment charges the defendant BALLAM DUDLEY committed the crime of mail fraud. Under Counts 23 and 41, the indictment charges the defendant BALLAM DUDLEY committed the crime of wire fraud.

Each defendant has pled not guilty to each of those charges.

Keep in mind that each count charges a separate crime. You must consider each count separately, and return a separate verdict for each count.

Keep in mind that you must give separate consideration to the evidence about each individual defendant. Each defendant is entitled to be treated separately, and you must return a separate verdict for each defendant. Also keep in mind that you must consider, separately, each crime charged against each individual defendant, and you must return a separate verdict for each of those crimes charged. The fact that you may find a defendant guilty or not guilty as to one of the offenses charged should not control your verdict as to any other offense charged.

# 21. INDICTMENT

20 cr 232 DSD/kmm

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,

v.

(1) RUSSELL JASON RAHM,
   also known as "Rusty Rahm,"
(2) TERRY LYNN CHRISTENSEN,
(3) JANNICE KRISTINA LAUR,
(4) PETRA JINETTE LABOY,
(5) DAVID JOHN MOULDER,
(6) ANTHONY EUGENE MOULDER,
(7) RHONDA JEAN MOULDER,
(8) BARBARA ANN MOULDER,
(9) LUIS ORLANDO MENDIZABAL,
(10) JEFFREY LEE SMOLIAK,
(11) JOHN MICHAEL BLALOCK,
(12) LLOYD JOSEPH LOFTIS,
(13) BRYANT JARODE CRITTEN,
(14) NATESHA JAHMELIA MARSON,
(15) THOMAS ATHANASIOS KIRITSIS,
(16) DANIEL MORRIS KLIBANOFF,
(17) BRIAN DOUGLASS COX,
(18) JOHN THOMAS HARBERT III,
(19) AMONDO ANTOINE MILLER,
(20) KILEY MARIE SAINDON,
   also known as "Kiley Lucero,"
(21) HENRY ARAGON,
(22) LUCILLE J. PATTERSON,
   also known as "Lucille Makatura,"
(23) JAMES ANTHONY SIERRA,
(24) TARA NICOLE CREASON,
(25) YVONNE PATTERSON,
(26) CHARITIE A. SEELYE,
(27) BONNIE LEE COLBERT,
   also known as "Bonnie Rankin,"
(28) JENNIFER LYNN GIRARDIN,
   also known as "Jennifer Key" and
   "Jennifer Roybal,"
(29) JESSICA MARIE PRINCE,

INDICTMENT

18 U.S.C. § 1349
18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 2326

SCANNED
OCT 20 2020
U.S. DISTRICT COURT MPLS

(30) BRIAN JAMES WILLIAMS,
(31) TASHENA LAVERA CRUMP,
(32) JARED THOMAS MICHELIZZI,
(33) ERIC PATRICK McGARRITY,
(34) ANDREW JOHN LANDSEM,
(35) BALLAM HAZEAKIAH DUDLEY,
(36) CAITLIN COLLEEN SCHLUSSER,
(37) MONICA SABINA SHARMA-
  HANSSEN,
(38) TIMOTHY PAUL HANSSEN,
  also known as "Scotty,"
(39) CORLOS KENTRELL SMITH,
(40) STACEY LEIGH PERSONS,
  also known as "Stacey Granberry,"
(41) PATRICIA NICHOLE SHINN,
  also known as "Nikki,"
(42) LEEANN GARCIA,
  also known as "Cali," and
(43) ERIC STEPHEN ESHERICK,

Defendants.

THE UNITED STATES GRAND JURY CHARGES:

## OVERVIEW

1.    Over the past twenty years, the defendants devised and carried out a telemarketing scheme to defraud victim-consumers located across the United States, many of whom were elderly and vulnerable. They accomplished their fraud scheme by calling victim-consumers who had one or more existing magazine subscriptions and offering to "renew" the existing magazine subscriptions, often at a reduced cost. In reality, the defendants were not calling to renew or reduce the price of the existing subscriptions. Instead, the defendants tricked their victims into signing up for entirely new magazine subscriptions, which they did not want and often could not afford.

2

2.     The defendants and their companies bought and sold lists of victim-consumers who had active and ongoing magazine subscriptions for use in carrying out the scheme. As a result, many victim-consumers were victimized by multiple magazine companies. Some were fraudulently billed by as many as ten companies at a time and received more than $1,000 in monthly magazine subscription charges. In all, the defendants stole more than $300 million from more than 150,000 victims using this scheme.

### COUNT 1
(Conspiracy To Commit Mail Fraud)

3.     At times relevant to this Indictment:

a.     Defendant RUSSELL RAHM was the owner and Chief Executive Officer of several Kansas-based companies involved in fraudulent magazine sales, including Subscription Ink Co. and Millennium Marketing. Defendant RAHM and his companies provided an array of services to companies involved in fraudulent magazine telemarketing sales. Among other things, defendant RAHM and his companies provided sales leads and handled order management, billing, and collections for companies involved in fraudulent magazine sales in exchange for a percentage of the revenue received from victim-consumers. Subscription Ink Co. and Millennium Marketing were located in Shawnee, Kansas.

b.     Defendant TERRY CHRISTENSEN and Michael Jon Oelrich operated telemarketing call centers in Fort Lauderdale and Cape Coral, Florida, on behalf of defendant RAHM. Defendant CHRISTENSEN and Oelrich's call centers

3

were involved in fraudulent magazine sales to customers throughout the United States.

c.      Defendant CHRISTENSEN and Oelrich ran these call centers under a variety of company names, including MO Management LLC, Preferred Media Source Inc., Preferred Media Solutions, American Readers Service, Atlantic Media Source, North American Direct Service, Inc., and North America's Readers Choice. Defendant CHRISTENSEN and Oelrich ran the call centers at the direction of defendant RAHM. Defendant RAHM and his companies provided sales leads to the call centers, processed the orders, and handled customer billing and collections on behalf of the call centers. Defendant RAHM paid a percentage of the sales revenue to Oelrich in exchange for his operation of the call centers.

d.      Defendants JANNICE LAUR and PETRA LABOY worked as managers of the Fort Lauderdale and Cape Coral call centers.

e.      Defendant DAVID MOULDER was the owner and Chief Executive Officer of several Minnesota-based companies, including PS Online, Viking Magazine, Total Customer Service, and Direct Clearing, that provided an array of services to companies involved in fraudulent magazine sales.

f.      PS Online was a Minnesota-based company that provided customer relationship management ("CRM") software used by companies involved in fraudulent magazine sales. Total Customer Service was a Minnesota-based company that handled collections on behalf of companies involved in fraudulent magazine sales. PS Online and Total Customer Service were based in Burnsville, Minnesota.

4

g.      Defendant DAVID MOULDER also provided sales leads to a fraudulent magazine sales company run by his brother, defendant ANTHONY MOULDER.

h.      Defendant ANTHONY MOULDER owned and operated several Florida-based companies involved in fraudulent magazine sales, including Gulf Coast Readers Inc., ARCO Media Inc., KMK Magazines Inc., and Leisure Time Resources Inc. These companies operated telemarketing call centers in Cape Coral, Florida. Defendant ANTHONY MOULDER previously owned a Minnesota-based company involved in fraudulent magazine sales called Midwest Readers.

i.      Defendant RHONDA MOULDER was the manager of Gulf Coast Readers Inc. and ARCO Media Inc.

j.      In or about March 2014, Gulf Coast Readers Inc. and defendants ANTHONY MOULDER and RHONDA MOULDER entered into an Assurance of Voluntary Compliance with the Florida Attorney General's Office. As part of the agreement, Gulf Coast Readers Inc. and defendants ANTHONY MOULDER and RHONDA MOULDER agreed to cease and desist certain practices, including "making any misrepresentations, or false or deceptive statements, in any communications with consumers." The companies also agreed to "[r]evise any and all scripts used for inbound and outbound calls to provide consumers with Clear and Conspicuous disclosures as to the material terms of any magazine subscription or other product purchased by the consumer, including but not limited to: the name of the magazines ordered, length of the subscription, number of payments, amount of each payment, payment schedule (i.e. monthly, quarterly or annually), method of payment and

5

cancellation policy, and ensure that each sales representative is provided with and substantially follows such script(s)." They also agreed to "[c]ease and desist from placing any unauthorized charges on consumers' credit or debit cards or bank accounts."

   k. Approximately two months later, on June 1, 2014, defendant ANTHONY MOULDER incorporated another company, ARCO Media Inc., for use in conducting fraudulent magazine sales.

   l. Defendants BARBARA MOULDER, LUIS ORLANDO MENDIZABAL, and JEFFREY SMOLIAK were telemarketers who conducted fraudulent magazine sales for ARCO Media Inc. and Gulf Coast Readers Inc. MENDIZABAL and SMOLIAK worked at the call center in Cape Coral, Florida. BARBARA MOULDER worked from her home in Minneapolis, Minnesota.

   m. Defendant JOHN BLALOCK was the nominal owner and manager of Leisure Time Resources Inc., a Florida-based company involved in fraudulent magazine sales. Leisure Time Resources Inc. operated a call center in Cape Coral, Florida.

   n. Defendant LLOYD LOFTIS worked as a manager for defendant ANTHONY MOULDER's companies, including ARCO Media Inc. and Leisure Time Resources Inc.

   o. Defendants BRYANT CRITTEN, NATESHA MARSON, and THOMAS KIRITSIS were managers and telemarketers who conducted fraudulent magazine sales at Leisure Time Resources' call center in Cape Coral, Florida.

6

p.      Defendant   DANIEL   KLIBANOFF   owned   and   operated Multimedia Lists Inc., a North Carolina-based marketing firm that sold lead lists to companies involved in fraudulent magazine sales. Multimedia Lists Inc. was based in Ashville, North Carolina.

q.      Defendant BRIAN COX owned and operated Mater Marketing Inc., a Georgia-based marketing firm that sold lead lists to companies involved in fraudulent magazine sales. Mater Marketing Inc. was based in Locust Grove, Georgia.

r.      Defendant JOHN HARBERT III was a lead broker who sold lead lists to companies involved in fraudulent magazine sales from his home in Albuquerque, New Mexico.

s.      Defendant AMONDO MILLER owned and operated Power Sales and Marketing, a Colorado-based company that sold lead lists to companies involved in fraudulent magazine sales. MILLER also owned Magazine Solutions, a company involved in fraudulent magazine sales. Magazine Solutions had a telemarketing call center in Denver, Colorado.

t.      Defendant KILEY SAINDON was the manager of Magazine Solutions' call center in Denver, Colorado.

u.      Defendants HENRY ARAGON and LUCILLE PATTERSON owned several Colorado-based magazine sales companies involved in fraudulent magazine sales, including Resources Source LLC, Magazine Unlimited LLC, Magazine Connection LLC, Magazine Club LLC, and Readers Services Inc.

7

v.       In or about October 2011, the Attorney General for the State of Colorado filed a civil complaint against defendants ARAGON, LUCILLE PATTERSON, and several members of their extended family. The complaint alleged that ARAGON and LUCILLE PATTERSON were involved in a scheme to "deceive consumers into purchasing duplicative and expensive magazine subscriptions" by "pretend[ing] that they are the consumer's current magazine provider" calling to check on the status of an existing magazine subscription.

w.       In or about March 2012, defendants ARAGON and LUCILLE PATTERSON entered into a consent judgment with the Colorado Attorney General, agreeing to a permanent injunction barring them from owning, operating, or being involved in any company involved in magazine solicitations in the state of Colorado. Defendant ARAGON also agreed to pay $275,000 in fines, penalties, and restitution.

x.       After being barred from doing business in Colorado, defendants ARAGON and LUCILLE PATTERSON opened new companies in order to continue to engage in fraudulent magazine sales—first in Texas and later in Arizona. Defendant ARAGON owned and operated several Arizona-based companies involved in fraudulent magazine sales, including Magazine Direct LLC, Marketing Unlimited, and Digital Subscriptions Inc. ARAGON and his companies operated a telemarketing call center in Tempe, Arizona.

y.       Defendant JAMES ANTHONY SIERRA was the manager of defendant ARAGON's call centers in Colorado, Texas, and Arizona.

z.       Defendant LUCILLE PATTERSON owned Publishers Service, Inc., an Arizona-based company involved in fraudulent magazine sales. LUCILLE

8

PATTERSON and her company operated a telemarketing call center in Tempe, Arizona.

    aa.    Defendants ARAGON and LUCILLE PATTERSON also owned and operated a telemarketing call center in Little Rock, Arkansas.

    bb.    Defendant TARA NICOLE CREASON was the manager of the Little Rock call center.

    cc.    Defendant YVONNE PATTERSON owned and operated Angels LLC, a Missouri-based company involved in fraudulent magazine sales. YVONNE PATTERSON and her company ran telemarketing call centers in Thayer, Missouri, and Pekin, Illinois.

    dd.    Defendant CHARITIE SEELYE managed the Pekin, Illinois, call center on behalf of defendant YVONNE PATTERSON.

    ee.    Defendant BONNIE COLBERT was a telemarketer who conducted fraudulent magazine sales for Angels LLC.

    ff.    Defendant JENNIFER GIRARDIN owned Readers Club of America, a Missouri-based company involved in fraudulent magazine sales. Readers Club of America ran a telemarketing call center in Thayer, Missouri.

    gg.    Defendant JESSICA PRINCE managed Readers Club of America's call center in Thayer, Missouri, on behalf of defendant GIRARDIN.

    hh.    Defendant BRIAN WILLIAMS owned and operated several Minnesota-based companies involved in fraudulent magazine sales, including Readers Club Home Office, Pacific Renewal, and Tropical Readers. WILLIAMS's companies operated call centers in South St. Paul, Minnesota.

9

ii.   Defendant TASHENA CRUMP was the manager of defendant WILLIAMS's call centers in South St. Paul, Minnesota.

jj.   Defendant JARED MICHELIZZI owned and operated several Minnesota-based companies involved in fraudulent magazine sales, including West Side Readerz and Central Subscription Services. MICHELLIZI's companies ran a call center in Fridley, Minnesota.

kk.   Defendants ERIC McGARRITY, ANDREW LANDSEM, and BALLAM DUDLEY were telemarketers who conducted fraudulent magazine sales for West Side Readerz and Central Subscription Services. McGARRITY and LANDSEM worked at the call center in Fridley, Minnesota. DUDLEY worked at the call center in Fridley, Minnesota, and later worked from his home in Fayetteville, Arkansas.

ll.   Defendants WILLIAMS and MICHELIZZI also owned and operated Pacific Beach Readers Club, a California-based company involved in fraudulent magazine sales. Pacific Beach Readers Club had a telemarketing call center in San Diego, California.

mm.   Defendant CAITLIN SCHLUSSER was the manager of Pacific Beach Readers Club's call center in San Diego.

nn.   Defendants MONICA SHARMA-HANSSEN and TIMOTHY HANSSEN owned and operated Midwest Publishers Home Office, a Minnesota-based company involved in fraudulent magazine sales. Midwest Publishers Home Office had a telemarketing call center in St. Louis Park, Minnesota.

10

oo.    Defendants CORLOS SMITH was a telemarketer who conducted fraudulent magazine sales for Midwest Publishers Home Office.

pp.    Defendant STACEY PERSONS owned and operated General Subscription Services and Amerimag Services LLC, two Minnesota-based companies involved in fraudulent magazine sales. The companies had a telemarketing call center in Fridley, Minnesota.

qq.    Defendants PATRICIA SHINN and LEEANN GARCIA were telemarketers who conducted fraudulent magazine sales for General Subscription Services and Amerimag Services LLC.

rr.    Defendant ERIC ESHERICK owned and operated Quality Readers LLC, a Minnesota-based company involved in fraudulent magazine sales. ESHERICK ran Quality Readers LLC from his home in Andover, Minnesota.

4.    From at least in or about 2000 through in or about 2020, in the State and District of Minnesota, and elsewhere, the defendants,

RUSSELL JASON RAHM,
also known as "Rusty Rahm,"
TERRY LYNN CHRISTENSEN,
JANNICE KRISTINA LAUR,
PETRA JINETTE LABOY,
DAVID JOHN MOULDER,
ANTHONY EUGENE MOULDER,
RHONDA JEAN MOULDER,
BARBARA ANN MOULDER,
LUIS ORLANDO MENDIZABAL,
JEFFREY LEE SMOLIAK,
JOHN MICHAEL BLALOCK,
LLOYD JOSEPH LOFTIS,
BRYANT JARODE CRITTEN,
NATESHA JAHMELIA MARSON,
THOMAS ATHANASIOS KIRITSIS,
DANIEL MORRIS KLIBANOFF,

11

BRIAN DOUGLASS COX,
JOHN THOMAS HARBERT III,
AMONDO ANTOINE MILLER,
KILEY MARIE SAINDON,
also known as "Kiley Lucero,"
HENRY ARAGON,
LUCILLE J. PATTERSON,
also known as "Lucille Makatura,"
JAMES ANTHONY SIERRA,
TARA NICOLE CREASON,
YVONNE PATTERSON,
CHARITIE A. SEELYE,
BONNIE LEE COLBERT,
also known as "Bonnie Rankin,"
JENNIFER LYNN GIRARDIN,
also known as "Jennifer Key" and "Jennifer Roybal,"
JESSICA MARIE PRINCE,
BRIAN JAMES WILLIAMS,
JARED THOMAS MICHELIZZI,
TASHENA LAVERA CRUMP,
ERIC PATRICK McGARRITY,
ANDREW JOHN LANDSEM,
BALLAM HAZEAKIAH DUDLEY,
CAITLIN COLLEEN SCHLUSSER,
MONICA SABINA SHARMA-HANSSEN,
TIMOTHY PAUL HANSSEN,
also known as "Scotty,"
CORLOS KENTRELL SMITH,
STACEY LEIGH PERSONS,
also known as "Stacey Granberry,"
PATRICIA NICHOLE SHINN,
also known as "Nikki,"
LEEANN GARCIA,
also known as "Cali," and
ERIC STEPHEN ESHERICK,

did knowingly conspire with each other, and others known and unknown to the grand

jury, to devise a scheme and artifice to defraud and to obtain money by materially

false and fraudulent pretenses, representations, and promises, in connection with the

conduct of telemarketing that victimized ten or more persons over the age of 55, and

for the purpose of executing such scheme and artifice, caused the sending, delivering,

12

and receipt of various matters and things by United States Postal Service and private and commercial interstate carrier, in violation of Title 18, United States Code, Sections 1341, 1349, and 2326.

### Overview and Purpose of the Conspiracy

5.      The purpose of the conspiracy was to carry out a telemarketing fraud scheme involving magazine subscription sales. The conspiracy involved a nationwide network of telemarketing companies involved in fraudulent magazine sales. These companies used sales scripts to defraud victim-consumers, many of whom were elderly and otherwise vulnerable, across the United States. The fraudulent sales scripts were designed to induce consumers, through a series of lies and misrepresentations, into unwittingly signing up for expensive magazine subscriptions.

### Defendants and Their Roles

6.      The defendants and other members of the conspiracy worked together to carry out the fraudulent magazine sales scheme. The defendants held a number of different roles in the conspiracy and it was not uncommon for a member of the conspiracy to hold more than one role. The roles in the conspiracy included:

a.      **Scheme Leaders:** Defendants RUSSELL RAHM and DAVID MOULDER owned companies that provided an array of services to companies involved in fraudulent magazine sales. Among other things, defendants RAHM and DAVID MOULDER provided customer relationship management ("CRM") software programs that tracked orders, sales, and other customer information for companies involved in the fraudulent magazine sales scheme. Defendants RAHM and DAVID

13

MOULDER provided lead lists of consumers who had ongoing and active magazine subscriptions to companies involved in fraudulent magazine sales. Defendants RAHM and DAVID MOULDER, through their companies, loaded sales leads onto automated voice dialers that were used by the telemarketing call centers to call victim-consumers across the country. Defendants RAHM and DAVID MOULDER knew that the companies using the leads would attempt to defraud consumers on the lead lists by contacting them and pretending to be calling from the victim-consumers' existing magazine company about an existing subscription. Defendants RAHM and DAVID MOULDER and their companies sent out confirmation letters, invoices, bills, and collections letters to victim-consumers who had been defrauded by fraudulent magazine sales companies.

      b.    **Company Owners:** Defendants ANTHONY MOULDER, JOHN BLALOCK, AMONDO MILLER, HENRY ARAGON, LUCILLE PATTERSON, YVONNE PATTERSON, JENNIFER GIRARDIN, BRIAN WILLIAMS, JARED MICHELIZZI, MONICA SHARMA-HANSSEN, TIMOTHY HANSSEN, STACEY PERSONS, ERIC ESHERICK, and others (the "Company Owners") owned companies involved in fraudulent magazine sales. The Company Owners operated telemarketing call centers at which telemarketers used fraudulent sales scripts to trick victim-consumers into unwittingly signing up for expensive magazine subscriptions.

      c.    **Call Center Managers:** Defendants TERRY CHRISTENSEN, JANNICE LAUR, PETRA LABOY, RHONDA MOULDER, LLOYD LOFTIS, BRYANT CRITTEN, NATESHA MARSON, THOMAS KIRITSIS, KILEY SAINDON, JAMES SIERRA, TARA NICOLE CREASON, CHARITIE SEELYE, JESSICA

14

PRINCE, and TASHENA CRUMP (the "Call Center Managers") managed call centers involved in fraudulent magazine sales. The Call Center Managers trained telemarketers to use the fraudulent sales scripts to defraud victim-consumers and supervised the call centers on a day-to-day basis. Many Call Center Managers also conducted fraudulent magazine sales.

d.      **Telemarketers**: Defendants BARBARA MOULDER, LUIS MENDIZABAL, JEFFREY SMOLIAK, BONNIE COLBERT, ERIC McGARRITY, ANDREW LANDSEM, BALLAM DUDLEY, CORLOS SMITH, PATRICIA SHINN, and LEEANN GARCIA (the "Telemarketers") were telemarketers at the call centers. The Telemarketers called victim-consumers around the United States using fraudulent sales scripts and, through a series of knowing and deliberate lies and misstatements, tricked the victim-consumers into unwittingly signing up for expensive new magazine subscriptions.

e.      **Lead Brokers**: Defendants DANIEL KLIBANOFF, BRIAN COX, JOHN HARBERT III, and AMONDO MILLER (the "Lead Brokers") were lead brokers in the business of buying and selling lead lists to fraudulent magazine sales companies. The Lead Brokers provided lead lists of consumers who had active and ongoing magazine subscriptions through other companies. The Lead Brokers provided these lead lists to the Company Owners knowing that they would use them to carry out the fraud scheme.

15

## Manner and Means of the Conspiracy

7.      The Company Owners operated telemarketing call centers throughout the United States, including in Minnesota, Florida, Kansas, Missouri, Illinois, Arizona, Arkansas, Texas, and Colorado.

8.      As part of the scheme, Company Owners purchased lead lists from the Lead Brokers. The lead lists contained consumers who had active and ongoing magazine subscriptions through other companies. These lists were referred to as "paid-during-service" or "PDS" leads. Some of the PDS lead lists identified the magazines to which the individuals were currently subscribed and the credit card number or other payment information used to pay for the subscription. Telemarketers used the information on the PDS lead lists to fraudulently pose as the victim-consumers' existing magazine provider, calling about an existing subscription, rather than attempting to sign consumers up for an entirely new magazine subscription.

9.      The Lead Brokers specifically marketed PDS lead lists to companies involved in the fraudulent magazine sales scheme. The Lead Brokers knew that many of the consumers on this list were elderly and susceptible to fraudulent and deceptive sales tactics. They also knew that PDS lists were particularly valuable to companies engaged in fraudulent magazine sales because the companies posed as the victim-consumers' existing magazine company to trick them into signing up for new subscriptions. Accordingly, PDS lead lists commanded a significant premium and sold for as much as $10 or $15 per name.

16

10.     The Company Owners provided PDS lead lists to the Call Center Managers and Telemarketers. At the direction of the Company Owners and Call Center Managers, the Telemarketers called the names on the PDS lead lists using fraudulent sales scripts. The scripts directed the Telemarketers to claim—falsely— that they were calling from the victim-consumers' existing magazine subscription company and about an existing magazine subscription. The Telemarketers claimed— again falsely—to be calling with an offer to renew the victim-consumer's existing magazine subscription, often at a reduced cost. In reality, the companies had no existing relationship with most of the victim-consumers and the Telemarketers were not calling about an existing magazine subscription. Instead they were calling to defraud them by tricking them into unwittingly signing up for entirely new magazine subscriptions. Some companies would also call lists of their own victim-consumers and, using a similarly fraudulent script, trick them into signing up for additional magazine subscriptions.

11.     The Company Owners, Call Center Managers, Telemarketers, and Lead Brokers all knew that many of the consumers on these lists were elderly and susceptible to fraudulent and deceptive sales tactics. Nevertheless, the defendants called people on these lists and tricked them into signing up for expensive magazine subscription packages.

12.     The Company Owners also bought and sold lists of their own victim-consumers to one another. As with the PDS lead lists purchased from the Lead Brokers, the Company Owners directed the Telemarketers to use this information to fraudulently pose as the victim-consumers' existing magazine company and falsely

17

-41-

claim to be calling with an offer to renew or reduce the price of an existing magazine subscription. As a result, many victim-consumers were victimized again and again by multiple magazine companies. Some victim-consumers were fraudulently billed by ten or more magazine companies at a time and received more than $1,000 in magazine subscription charges in a month.

13.    The Company Owners took steps to cover up their fraud. The Company Owners and Call Center Managers directed the Telemarketers to record only a final portion of the call, during which the Telemarketers "verified" that the victim-consumers were purchasing a new magazine subscription package. The Company Owners and Call Center Managers instructed the Telemarketers not to record the earlier portion of the call, during which they falsely represented that they were calling to lower the payments on an existing magazine subscription. The Company Owners later used these deceptive recordings when victim-consumers attempted to challenge the charges and reported the fraud to the Better Business Bureau ("BBB"), state Attorney General offices, and other regulatory agencies.

14.    The Company Owners often operated call centers under multiple company names to disguise the scope of their fraud scheme. The Company Owners sought to spread out the number of consumer complaints among multiple companies to reduce the likelihood that any single company would come under investigation by the BBB or a state Attorney General's office.

15.    Some Company Owners hid the identity and location of their companies by registering the companies with multiple out-of-state secretary of state offices and using virtual offices in different states as the companies' mailing address. The

18

Company Owners did this to confuse victim-consumers and make it difficult for them
to identify the company that was fraudulently billing them.

16. During the course of their scheme, the co-conspirators defrauded more
than 150,000 victims across the United States. In all, they received more than $300
million from the victims of the scheme.

All in violation of Title 18, United States Code, Sections 1349 and 2326.

### Counts 2-10
(Mail Fraud)

17. The allegations in paragraphs 1 through 16 of the Indictment are
incorporated herein.

18. From at least in or about 2000 through in or about 2020, in the State
and District of Minnesota, and elsewhere, the defendants,

> ANTHONY EUGENE MOULDER,
> RHONDA JEAN MOULDER,
> BARBARA ANN MOULDER,
> LLOYD JOSEPH LOFTIS,
> JOHN THOMAS HARBERT III,
> BRIAN JAMES WILLIAMS,
> JARED THOMAS MICHELIZZI,
> ERIC PATRICK McGARRITY,
> ANDREW JOHN LANDSEM,
> BALLAM HAZEAKIAH DUDLEY,
> MONICA SABINA SHARMA-HANSSEN,
> TIMOTHY PAUL HANSSEN,
> also known as "Scotty,"
> CORLOS KENTRELL SMITH, and
> STACEY LEIGH PERSONS,
> also known as "Stacey Granberry,"

and others known and unknown to the grand jury, and in connection with the conduct
of telemarketing that victimized ten or more persons over the age of 55, did knowingly
devise and participate in a scheme and artifice to defraud and to obtain money by

19

means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts.

19.    On or about the dates listed below, in the State and District of Minnesota and elsewhere, the defendants, as set forth below, for the purpose of executing the scheme described above, knowingly caused to be sent by the U.S. Postal Service certain matters or things, including the following:

| Count | Defendants | Date (on or about) | Matter/Thing |
|---|---|---|---|
| 2 | WILLIAMS | January 4, 2016 | A letter sent from Readers Club Home Office in Minnesota to Victim Patrick R. in Virginia |
| 3 | SHARMA-HANSSEN, HANSSEN | December 5, 2016 | A letter sent from Midwest Publishers Inc. in Minnesota to Victim Wanda Z. in Pennsylvania |
| 4 | PERSONS | February 5, 2018 | A letter sent from Amerimag Services in Minnesota to Victim Kathleen M. in Ohio |
| 5 | SHARMA-HANSSEN, HANSSEN, SMITH | December 19, 2018 | A check sent from Victim Phyllis S. in New York to Midwest Publishers Home Office in Minnesota |
| 6 | MICHELIZZI, McGARRITY, DUDLEY | May 28, 2019 | A check sent from Victim Phyllis S. in New York to Central Subscription Service in Minnesota |
| 7 | HARBERT, MICHELIZZI | October 3, 2019 | A package sent from HARBERT in New Mexico to West Side Readerz in Minnesota containing hard copy lead sheets |
| 8 | ANTHONY MOULDER, RHONDA MOULDER, BARBARA MOULDER, LOFTIS | December 11, 2019 | A package sent from LOFTIS in Florida to BARBARA MOULDER in Minnesota containing hard copy lead lists |
| 9 | MICHELIZZI, LANDSEM | December 27, 2019 | A letter sent from Central Subscription Service in Minnesota to the undercover Postal Inspection Service employee |

20

-44-

| | | | posing as "Virginia Cova" in Michigan |
| --- | --- | --- | --- |
| 10 | SCHARMA-HANSSEN, HANSSEN | February 12, 2020 | A check for $59.90 made out to Midwest Publishers sent from Victim Barbara W. in New Jersey to Midwest Publishers Home Office in Minnesota |

All in violation of Title 18, United States Code, Sections 1341 and 2326.

## Counts 11-53
### (Wire Fraud)

20.     The allegations in paragraphs 1 through 19 of the Indictment are

incorporated herein.

21.     From at least in or about 2000 through in or about 2020, in the State

and District of Minnesota, and elsewhere, the defendants,

RUSSELL JASON RAHM,
also known as "Rusty Rahm,"
TERRY LYNN CHRISTENSEN,
JANNICE KRISTINA LAUR,
PETRA JINETTE LABOY,
DAVID JOHN MOULDER,
ANTHONY EUGENE MOULDER,
RHONDA JEAN MOULDER,
BARBARA ANN MOULDER,
LUIS ORLANDO MENDIZABAL,
JEFFREY LEE SMOLIAK,
JOHN MICHAEL BLALOCK,
LLOYD JOSEPH LOFTIS,
NATESHA JAHMELIA MARSON,
THOMAS ATHANASIOS KIRITSIS,
DANIEL MORRIS KLIBANOFF,
BRIAN DOUGLASS COX,
JOHN THOMAS HARBERT III,
AMONDO ANTOINE MILLER,
KILEY MARIE SAINDON,
also known as "Kiley Lucero,"
HENRY ARAGON,
LUCILLE J. PATTERSON,
also known as "Lucille Makatura,"

21

-45-

JAMES ANTHONY SIERRA,
YVONNE PATTERSON,
CHARITIE A. SEELYE,
BONNIE LEE COLBERT,
also known as "Bonnie Rankin,"
JENNIFER LYNN GIRARDIN,
also known as "Jennifer Key" and "Jennifer Roybal,"
JESSICA MARIE PRINCE,
BRIAN JAMES WILLIAMS,
JARED THOMAS MICHELIZZI,
TASHENA LAVERA CRUMP,
ERIC PATRICK McGARRITY,
ANDREW JOHN LANDSEM,
BALLAM HAZEAKIAH DUDLEY,
CAITLIN COLLEEN SCHLUSSER,
MONICA SABINA SHARMA-HANSSEN,
TIMOTHY PAUL HANSSEN,
also known as "Scotty,"
CORLOS KENTRELL SMITH,
STACEY LEIGH PERSONS,
also known as "Stacey Granberry,"
PATRICIA NICHOLE SHINN,
also known as "Nikki,"
LEEANN GARCIA,
also known as "Cali," and
ERIC STEPHEN ESHERICK,

and others known and unknown to the grand jury, and in connection with the conduct of telemarketing that victimized ten or more persons over the age of 55, did knowingly devise and participate in a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts.

22. On or about the dates listed below, in the State and District of Minnesota and elsewhere, the defendants, as set forth below, for the purpose of executing the scheme described above, knowingly caused to be transmitted by means

22

of a wire communication in interstate commerce, certain writings, signs, signals, and sounds, including the following:

| Count | Defendant | Date (Approximate) | Wire Communication |
|---|---|---|---|
| 11 | MILLER, MICHELIZZI | April 11, 2016 | An email containing a PDS test file from MILLER in Colorado to MICHELIZZI in Minnesota |
| 12 | DAVID MOULDER, GIRARDIN, PRINCE | May 13, 2016 | A wire communication from Readers Club of America in Missouri to PS Online in Minnesota related to a magazine sale to victim Jonathan P. |
| 13 | DAVID MOULDER, GIRARDIN, PRINCE | May 19, 2016 | A wire communication from Readers Club of America in Missouri to PS Online in Minnesota related to a magazine sale to victim Phyllis S. |
| 14 | DAVID MOULDER, ANTHONY MOULDER, RHONDA MOULDER, MENDIZABAL, BLALOCK, LOFTIS | June 19, 2016 | A wire communication from Leisure Time Resources Inc. in Florida to PS Online in Minnesota related to a charge to Victim Elizabeth H. |
| 15 | MILLER, MICHELIZZI | June 27, 2016 | An email with the subject line "Hard copies" from MILLER in Colorado to MICHELIZZI in Minnesota |
| 16 | DAVID MOULDER, ANTHONY MOULDER, RHONDA MOULDER, BLALOCK, LOFTIS, KIRITSIS | August 8, 2016 | A wire communication from Leisure Time Resources Inc. in Florida to PS Online in Minnesota related to a magazine charge to Victim Phyllis S. |
| 17 | YVONNE PATTERSON, SEELYE, COLBERT | March 3, 2017 | A phone call from an employee of Angels LLC to Victim Sharon G. in Minnesota |
| 18 | DAVID MOULDER, MILLER, SAINDON | March 7, 2017 | A wire communication from Magazine Solutions in Colorado to PS Online in Minnesota related to a charge to Victim Phyllis S. |

23

| 19 | DAVID MOULDER, ANTHONY MOULDER, RHONDA MOULDER, LOFTIS | May 11, 2017 | A wire communication from Gulf Coast Readers Inc. in Florida to PS Online in Minnesota related to a charge to Victim Marina G. |
|----|----|----|----|
| 20 | ARAGON, SIERRA | July 3, 2017 | A phone call from an employee of Magazine Direct to Victim Sharon G. in Minnesota |
| 21 | MILLER, SAINDON | July 21, 2017 | A phone call from an employee of Magazine Solutions in Colorado to Victim Sharon G. in Minnesota |
| 22 | DAVID MOULDER, ANTHONY MOULDER, RHONDA MOULDER, BLALOCK, LOFTIS, MENDIZABAL, KIRITSIS | August 9, 2017 | A wire communication from Leisure Time Resources Inc. in Florida to PS Online in Minnesota related to a charge to Victim Phyllis S. |
| 23 | MICHELIZZI, DUDLEY | September 14, 2017 | A phone call from DUDLEY in Minnesota to Victim Jonathan P. in Oregon |
| 24 | ESHERICK | March 12, 2018 | A wire communication from ESHERICK in Minnesota to an out-of-state server processing a $49.90 charge to the credit card of Victim Jonathan P. |
| 25 | DAVID MOULDER, ANTHONY MOULDER, RHONDA MOULDER, LOFTIS | May 1, 2018 | A wire communication from ARCO Media Inc. in Florida to PS Online in Minnesota related to a charge to Victim Traci F. |
| 26 | HARBERT, MILLER, ESHERICK | August 15, 2018 | An email with the subject line "Fwd: Part 4 of 5" from HARBERT in New Mexico to ESHERICK in Minnesota |
| 27 | YVONNE PATTERSON, SEELYE, COLBERT | August 31, 2018 | A phone call from an employee of Angels LLC to Victim Conner L. in Minnesota |
| 28 | ARAGON, SIERRA | September 20, 2018 | A wire transfer of approximately $11,935 from a merchant account held by Magazine Direct at Merrick Bank in New York to a business account held by Magazine Direct at Wells Fargo |

24

| | | | that passed through Wells Fargo servers located in Minnesota |
|---|---|---|---|
| 29 | DAVID MOULDER, SHARMA-HANSSEN, HANSSEN, SMITH | October 5, 2018 | A phone call from SMITH in Minnesota to Victim Peter B. in Pennsylvania |
| 30 | RAHM, CHRISTENSEN, LAUR, LABOY, DAVID MOULDER | October 12, 2018 | A wire communication from Preferred Media Solutions in Florida to PS Online in Minnesota related to a charge to Victim Melissa A. |
| 31 | RAHM, CHRISTENSEN, LAUR, LABOY, DAVID MOULDER | October 15, 2018 | A wire communication from Preferred Media Solutions in Florida to PS Online in Minnesota related to a charge to Victim Paula C. |
| 32 | MILLER, LUCILLE PATTERSON | October 22, 2018 | A phone call from an employee of Publishers Service, Inc. in Arizona to Victim Sharon G. in Minnesota |
| 33 | RAHM, CHRISTENSEN, LAUR, LABOY, DAVID MOULDER | November 14, 2018 | A wire communication from Preferred Media Solutions in Florida to PS Online in Minnesota related to a charge to Victim Teresa S. |
| 34 | RAHM, CHRISTENSEN, LAUR, LABOY, DAVID MOULDER | December 26, 2018 | A wire communication from Preferred Media Solutions in Florida to PS Online in Minnesota related to a charge to Victim Gloria O. |
| 35 | KLIBANOFF, PERSONS | February 18, 2019 | An email with the subject line "Multimedia Lists PDS Test File" from an employee at Multimedia Lists Inc. in North Carolina to KLIBANOFF and PERSONS in Minnesota |
| 36 | KLIBANOFF, WILLIAMS, CRUMP | February 18, 2019 | An email with the subject line "Multimedia Lists PDS Test File" from an employee at Multimedia Lists Inc. in North Carolina to KLIBANOFF and CRUMP in Minnesota |
| 37 | DAVID MOULDER, ANTHONY MOULDER, | April 24, 2019 | A wire communication from Leisure Time Resources Inc. in |

25

|  | RHONDA MOULDER, BLALOCK, LOFTIS, MARSON, KIRITSIS |  | Florida to PS Online in Minnesota related to a charge to Victim Bonita C. |
|---|---|---|---|
| 38 | RAHM, DAVID MOULDER | May 2, 2019 | An email with the subject line "Invoice 5534 from PS Online" from a PS Online employee in Minnesota to Individuals JH and AL in Kansas |
| 39 | DAVID MOULDER, ANTHONY MOULDER, LOFTIS, BLALOCK | May 2, 2019 | An email with the subject line "Invoice 5526 from PS Online" from a PS Online employee in Minnesota to LOFTIS in Florida |
| 40 | DAVID MOULDER, WILLIAMS, CRUMP | May 2, 2019 | An email with the subject line "Invoice 5537 from PS Online" from a PS Online in Minnesota to WILLIAMS and CRUMP that passed through Yahoo! email servers located outside the state of Minnesota |
| 41 | MICHELIZZI, McGARRITY, DUDLEY | July 9, 2019 | A phone call from McGARRITY in Minnesota to Victim Phyllis S. in New York |
| 42 | COX, SIERRA SHARMA-HANSSEN, HANSSEN | July 16, 2019 | An email with the subject line "Files Available!!!" from COX in Georgia to SIERRA and HANSSEN in Minnesota |
| 43 | COX, SHARMA-HANSSEN, HANSSEN | July 17, 2019 | An email with the subject line "Premiums handwrites attached" from COX in Georgia to HANSSEN in Minnesota |
| 44 | COX, SHARMA-HANSSEN, HANSSEN, SMITH | July 18, 2019 | A wire communication from Midwest Publishers Home Office in Minnesota to an out-of-state server processing a $44.90 charge to the credit card of an undercover Postal Inspector posing as "Rose Cubur" |
| 45 | COX, SHARMA-HANSSEN, HANSSEN | July 23, 2019 | An email with the subject line "Re: Premium handwrites attached" from HANSSEN in Minnesota to SHARMA-HANSSEN and COX that |

26

| | | | |
|---|---|---|---|
| | | | passed through email servers located outside of Minnesota |
| 46 | RAHM, DAVID MOULDER | August 8, 2019 | An email with the subject line "TCS additional collections" from an employee of Subscription Ink Co. in Kansas to DAVID MOULDER in Minnesota and RAHM |
| 47 | HARBERT, WILLIAMS, CRUMP | October 1, 2019 | An email with the subject line "Re: John Harbert !" from HARBERT in New Mexico to CRUMP in Minnesota offering to sell handwritten lead lists |
| 48 | ANTHONY MOULDER, LOFTIS, RHONDA MOULDER, BARBARA MOULDER | December 11, 2019 | An email with the subject line "New leads" from LOFTIS in Florida to BARBARA MOULDER in Minnesota |
| 49 | PERSONS, SHINN, GARCIA | December 20, 2019 | A wire communication from Amerimag Services LLC in Minnesota to an out-of-state server processing a $49.90 charge to the credit card of an undercover FBI agent posing as "Chris Lee" |
| 50 | MICHELIZZI, LANDSEM | December 27, 2019 | A wire communication from Central Subscription Services in Minnesota to an out-of-state server processing a $59.80 charge to the credit card of an undercover Postal Inspection Service employee posing as "Virginia Cova" |
| 51 | RAHM, CHRISTENSEN, LAUR, LABOY | January 3, 2020 | A phone call from an employee of Preferred Media Solutions in Florida to an undercover posing as "Sarah Shadwick" |
| 52 | WILLIAMS, SCHLUSSLER | February 16, 2020 | A phone call from SCHLUSSLER in California on behalf of Pacific Beach Readers Club to an undercover FBI agent posing as "Timothy Brady" in Minnesota |

27

| 53 | SMOLIAK, MICHELIZZI | February 17, 2020 | A fax containing customer leads sent by SMOLIAK in Florida to MICHELIZZI in Minnesota |

All in violation of Title 18, United States Code, Sections 1343 and 2326.

## FORFEITURE ALLEGATIONS

23.     Counts 1 through 53 of this Indictment are incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) in conjunction with Title 28, United States Code, Section 2461(c).

24.     If convicted of any of Counts 1 through 53 of this Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to Counts 1 through 53 of the Indictment.

25.     If convicted of any of Counts 1 through 53 of this Indictment, the defendants shall also forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(8), any real or personal property used or intended to be used to commit, facilitate, or promote the commission of the mail and wire fraud schemes alleged in Counts 1 through 53 of the Indictment.

26.     The property subject to forfeiture includes, but is not limited to:

   a. $100,452.50 seized from Regions Bank, account No. 0263748037, in the name of ARCO Media Inc.;

   b. $105,943.21 seized from Regions Bank, account No. 0263748266, in the name of ARCO Media Inc.;

   c. $9,980.83 seized from Wells Fargo, account No. 3931950467, in the name of Magazine Direct;

28

d. $33,676.99 seized from Merrick Bank, merchant account No. 7851000000001164, in the name of Angels LLC;

e. $89,353.88 seized from Merrick Bank, account No. 7851000000001289, in the name of Central Subscription Service, Ltd.;

f. $40,313.40 seized from MidwestOne Bank, account No. 251835, in the name of West Side Readerz Inc.;

g. $49,200.70 seized from TCF National Bank, account No. 7868070788, in the name of Central Subscription Service Ltd.;

h. $43,579.77 seized from TCF National Bank, account No. 1852365176, in the name of Subscriber Service Center;

i. $30,722.30 seized from Associated Bank, account No. 2283264493, in the name of Midwest Publishers Home Office Inc. DBA Bee Marketing;

j. $50,821.04 seized from Associated Bank, account No. 2283264485, in the name of Midwest Publishers Home Office Inc.;

k. $2,360.96 seized from US Bank, account No. 104784814923, in the name of Brian J Williams DBA Tropical Readers;

l. $457.25 seized from Associated Bank, account No. 7645021071, in the name of Readers Club Home Office Inc.;

m. $402.71 seized from US Bank, account No. 104780000097, in the name of Readers Club of America;

n. $280.80 seized from TCF National Bank, account No. 3869928751, in the name of Tropical Readers;

o. Cashier's check # 20064 76977 in the amount of $48,000 dated 12/28/18 and made payable to Monica S. Hanssen;

p. Cashier's check # 20064 78496 in the amount of $50,000 dated 12/31/18 and made payable to Monica S. Hanssen;

q. Cashier's check # 2006677886 in the amount of $100,000 dated 02/20/20 and made payable to Monica S. Hanssen;

29

r.  Cashier's check # 2006677922 in the amount of $100,000 dated 02/20/20 and made payable to Monica Hanssen;

s.  $280.80 seized from TCF National Bank account number 3869928751, in the name of Tropical Readers;

t.  $402.71 seized from US Bank acct # 104780000097, in the name of Readers Club of America;

u.  $1,100 in U.S. Currency seized from Monica Sharma-Hanssen on February 19, 2020;

v.  $10,976 in U.S. Currency seized on February 21, 2020, from three safes at 10406 Shawnee Mission Parkway, Shawnee, Kansas, in the amounts of $10,355, $111, and $510, respectively;

w.  Brietling Watch, Super Avenger model A13370, serial number 252453;

x.  Miscellaneous jewelry seized from 46 Park Ave. N., Asheville, North Carolina on February 19, 2020;

y.  $12,380 in U.S. Currency seized from a safe at 46 Park Ave. N., Asheville, North Carolina on February 19, 2020;

z.  The real property located at 2 Maclynn Road, Excelsior, Minnesota;

aa. The real property located at 5416 51st Avenue N., Crystal, Minnesota;

bb. The real property located at RR1 Box 1195 C, Thayer, Missouri;

cc. The real property located at 910 W. Cape Estates Cir., Cape Coral, Florida;

dd. The real property located at 916 W. Cape Estates Cir., Cape Coral, Florida;

ee. The real property located at 1022 SE 46th Street, 1B, Cape Coral, Florida;

ff. The real property located at 17962 Judicial Road, Lakeville, Minnesota;

30

gg. The real property located at 10406 Shawnee Mission Parkway, Shawnee, Kansas;

hh. The real property located at 258 Belle Vista Court, Lake Ozark, Missouri; and

ii. The real property located at 10505 S. Highland Lane, Olathe, Kansas.

27.     If any of the above-described property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b).

A TRUE BILL

_____           _____
UNITED STATES ATTORNEY            FOREPERSON

31

## 22. VERDICT AS TO DEFENDANTS ONLY

You must determine whether the prosecution has proven beyond a reasonable doubt the guilt of each defendant for each charge in the indictment. The prosecution must prove beyond a reasonable doubt the essential elements of the crimes charged. The defendants are not on trial for any act or any conduct not specifically charged in the indictment. You are not called upon to return a verdict as to the guilt or innocence of any other person or persons.

So, if the evidence in the case convinces you beyond a reasonable doubt of the guilt of a defendant for the crime charged in the indictment, you should so find, even though you may believe that one or more other unindicted persons are also guilty. But if any reasonable doubt remains in your minds after impartial consideration of all the evidence in the case, it is your duty to find that defendant not guilty.

## 23. APPROXIMATE DATES

The indictment charges that the offenses alleged in the indictment were committed "on or about" certain dates.

Although it is necessary for the prosecution to prove beyond a reasonable doubt that an offense was committed on a date reasonably near the date alleged, it is not necessary for the prosecution to prove that an offense was committed precisely on the date charged.

## 24. PROOF OF INTENT OR KNOWLEDGE

Intent or knowledge may be proved like anything else.  You may consider any statements made and acts done by a defendant, and all the facts and circumstances in evidence that may aid in a determination of a defendant's knowledge or intent.

## 25. CONSPIRACY TO COMMIT MAIL FRAUD

It is a crime for two or more people to agree to commit a crime. The crime of conspiracy to commit mail fraud, as charged in Count 1 of the Indictment, has three elements:

*One*, at some time between 2000 and 2020, two or more persons reached an agreement to commit the crime of mail fraud;

*Two*, the defendant voluntarily and intentionally joined in the agreement, either at the time it was first reached or at some later time while it was still in effect;

*Three*, at the time the defendant joined the agreement, the defendant knew the purpose of the agreement; and

You will also be asked to decide whether the agreement was in connection with the conduct of telemarketing and victimized ten or more persons over the age of 55.

## 26. CONSPIRACY ELEMENT ONE

Element One requires that two or more people reached an agreement to commit the crime of mail fraud.

The indictment charges a conspiracy to commit mail fraud.  For you to find that the prosecution has proved a conspiracy, you must unanimously find that there was an agreement to act for this purpose.  You must unanimously agree which purpose motivated the members of the agreement to act.  If you are unable unanimously to agree on this purpose, you cannot find the defendant guilty of conspiracy.

The agreement between two or more people to commit the crime of mail fraud does not need to be a formal agreement or be in writing.  A verbal or oral understanding can be sufficient to establish an agreement.

It does not matter whether the crime of mail fraud was actually committed or whether the alleged participants in agreement actually succeeded in accomplishing their unlawful plan.

The agreement may last a long time or a short time.  The members of an agreement do not all have to join it at the same time.  A person may be a member of the agreement even if the person does not know all of the other members of the agreement or the person agreed to play only a minor part in the agreement.

## 27. CONSPIRACY ELEMENT TWO

Element Two requires that the defendant voluntarily and intentionally joined the agreement.

A person joins an agreement to commit mail fraud by voluntarily and intentionally participating in the unlawful plan with the intent to further the crime of mail fraud. It is not necessary for you to find that the defendant knew all of the details of the unlawful plan.

Evidence that a person was present at the scene of an event, or acted in the same way as others or associated with others, does not, alone, prove that the person joined a conspiracy. A person who has no knowledge of a conspiracy, but who happens to act in a way that advances the purpose of the conspiracy, does not thereby become a member. A person's mere knowledge of the existence of a conspiracy, or mere knowledge that an objective of a conspiracy was being considered or attempted, or mere approval of the purpose of a conspiracy, is not enough to prove that the person joined in a conspiracy.

To help you decide whether the defendant agreed to commit the crime of mail fraud, you should consider the elements of that crime as set forth below.

You may consider the elements of mail fraud in determining whether the defendant agreed to commit the crime of mail fraud, keeping in mind that this count of the indictment only charges a conspiracy to commit mail fraud, and does not charge that such crimes were actually committed.

## 28. CONSPIRACY ELEMENT THREE

Element Three requires that the defendant knew the purpose of the agreement at the time the defendant joined the agreement.

A person knows the purpose of the agreement if he is aware of the agreement and does not participate in it through ignorance, mistake, carelessness, negligence, or accident. It is seldom, if ever, possible to determine directly what was in the defendant's mind. Thus, the defendant's knowledge of the agreement and its purpose can be proved like anything else, from reasonable conclusions drawn from the evidence.

It is not enough that the defendant and other alleged participants in the agreement to commit the crime of mail fraud simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. The defendant must have known of the existence and purpose of the agreement. Without such knowledge, the defendant cannot be guilty of conspiracy, even if his acts furthered the conspiracy.

## 29. MULTIPLE CONSPIRACIES

The indictment charges that the defendants were members of one single conspiracy to commit the crime of mail fraud.  One of the issues you must decide is whether there were really two (or more) separate conspiracies.  The prosecution must convince you beyond a reasonable doubt that each defendant was a member of the conspiracy to commit the crime of mail fraud, as charged in the indictment.  If the prosecution fails to prove this as to a defendant, then you must find that defendant not guilty of the conspiracy charge, even if you find that he was a member of some other conspiracy.  Proof that a defendant was a member of some other conspiracy is not enough to convict.

A single conspiracy may exist even if all the members did not know each other, or never met together, or did not know what roles all the other members played.  And a single conspiracy may exist even if different members joined at different times, or the membership of the group changed.  Similarly, just because there were different subgroups operating in different places, or many different criminal acts committed over a long period of time, does not necessarily mean that there was more than one conspiracy.  These are factors you may consider in determining whether more than one conspiracy existed.

## 30. TELEMARKETING

In order to find that the conspiracy offense involved "telemarketing," you must find that the offense involved a plan, program, promotion, or campaign that was conducted to induce purchases of goods or services.  Either the person conducting the plan, program, promotion or campaign or a prospective purchaser, participant, or contributor must have used at least one interstate telephone call during the offense.

Telemarketing does not include the solicitation of sales through the mailing of a catalog or brochure that contains a written description or illustration of the goods or services offered for sales, includes the business address of the seller, includes multiple pages of written material or illustrations, and has been issued not less frequently than once a year, as long as the person making the solicitation does not solicit customers by telephone. The person making the solicitation can only receive calls initiated by customers in response to the catalog and during those calls take orders without further solicitation.

## 31. MAIL FRAUD

The crime of mail fraud has three elements, which are:

*One*, the defendant voluntarily and intentionally participated in a scheme to defraud to obtain money, property or property rights by means of material false representations or promises;

*Two*, the defendant did so with the intent to defraud;

*Three*, on or about the dates alleged in the indictment, the defendant used, or caused to be used, information transmitted by means of the United States Mail in furtherance of, or in an attempt to carry out, some essential step in the scheme to defraud; and

You will also be asked to decide whether the scheme was in connection with the conduct of telemarketing and victimized ten or more persons over the age of 55.

A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

If all the elements of mail fraud have been proved beyond a reasonable doubt as to a particular defendant with respect to a particular count, then you must find the defendant guilty on that count. If the prosecution has failed to prove one or more of these elements beyond a reasonable doubt, you must find the defendant not guilty as to the particular count you are considering.

## 32. MAIL FRAUD ELEMENT ONE

The first element that the prosecution must prove beyond a reasonable doubt is that the defendants participated in a "scheme to defraud." The phrase "scheme to defraud" includes any plan or course of action intended to deceive or cheat another out of property by employing material falsehoods. It also means the obtaining of money or property from another by means of material false representations or promises. A scheme to defraud need not be fraudulent on its face but must include some sort of fraudulent misrepresentation or promise reasonably calculated to deceive a reasonable person.

A statement or representation is "false" when it is untrue when made or effectively conceals or omits a material fact. A fact, falsehood, representation, or promise is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of a reasonable person in deciding whether to engage or not to engage in a particular transaction.

## 33. MAIL FRAUD ELEMENT TWO

The second element that the prosecution must prove beyond a reasonable doubt is that the defendant participated in the scheme to defraud with the intent to defraud.

To act with "intent to defraud" means to act knowingly and with the intent to deceive someone for the purpose of causing some financial loss to another or bringing about some financial gain to oneself or another to the detriment of a third party. With respect to false statements, the defendant must have known the statement was untrue when made or have made the statement with reckless indifference to its truth or falsity.

## 34. MAIL FRAUD ELEMENT THREE

The third element that the prosecution must prove beyond a reasonable doubt is that the defendant used, or caused to be used, information transmitted by means of the United States Mail or other interstate carrier in furtherance of, or in an attempt to carry out, some essential step in the scheme to defraud.

It is not necessary that the defendant him or herself contemplate the use of a mailing or that the defendant send or receive the actual mailing or specifically intend that a mailing be used.  It is sufficient if a mailing was in fact used to carry out the scheme and the use of a mailing by someone was reasonably foreseeable.  Mailings that are designed to lull victims into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are communications in furtherance of the scheme.

It is not necessary that the prosecution prove all the details alleged in the Indictment concerning the precise nature and purpose of the scheme, that the material mailed was itself false or fraudulent, that the alleged scheme actually succeeded in defrauding anyone, or that the use of the mail was intended as the specific or exclusive means of accomplishing the alleged fraud.

Each separate use of the mail in furtherance of the scheme to defraud constitutes a separate offense.

## 35. TELEMARKETING

In order to find that a mail fraud offense involved "telemarketing," you must find that the offense involved a plan, program, promotion, or campaign that was conducted to induce purchases of goods or services. Either the person conducting the plan, program, promotion or campaign or a prospective purchaser, participant, or contributor must have used at least one interstate telephone call during the offense.

Telemarketing does not include the solicitation of sales through the mailing of a catalog or brochure that contains a written description or illustration of the goods or services offered for sales, includes the business address of the seller, includes multiple pages of written material or illustrations, and has been issued not less frequently than once a year, as long as the person making the solicitation does not solicit customers by telephone. The person making the solicitation can only receive calls initiated by customers in response to the catalog and during those calls take orders without further solicitation.

## 36. WIRE FRAUD

The crime of wire fraud has three elements, which are:

*One*, the defendant voluntarily and intentionally participated in a scheme to defraud to obtain money, property or property rights by means of material false representations or promises;

*Two*, the defendant did so with the intent to defraud;

*Three*, on or about the dates alleged in the indictment, the defendant used, or caused to be used, an interstate wire communication in furtherance of, or in an attempt to carry out, some essential step in the scheme to defraud; and

You will also be asked to decide whether the scheme was in connection with the conduct of telemarketing and victimized ten or more persons over the age of 55.

A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

If all the elements of wire fraud have been proved beyond a reasonable doubt as to a particular defendant with respect to a particular count, then you must find the defendant guilty on that count. If the prosecution has failed to prove one or more of these elements beyond a reasonable doubt, you must find the defendant not guilty as to the particular count you are considering.

### 37. WIRE FRAUD ELEMENT ONE

The first element that the prosecution must prove beyond a reasonable doubt is that the defendants participated in a "scheme to defraud."

The phrase "scheme to defraud" includes any plan or course of action intended to deceive or cheat another out of money or property by employing material falsehoods, concealing material facts, or omitting material facts.  It also means the obtaining of money or property from another by means of material false representations or promises.  A scheme to defraud need not be fraudulent on its face but must include some sort of fraudulent misrepresentation or promise, or concealment of material facts, reasonably calculated to deceive a reasonable person.

A statement or representation is "false" when it is untrue when made or effectively conceals or omits a material fact.  With respect to false statements, the defendant must have known the statement was untrue when made or have made the statement with reckless indifference to its truth or falsity.

A fact, falsehood, representation, or promise is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of a reasonable person in deciding whether to engage or not to engage in a particular transaction.  However, whether a fact, falsehood, representation, or promise is "material" does not depend on whether the person was actually deceived.

## 38. WIRE FRAUD ELEMENT TWO

The second element that the prosecution must prove beyond a reasonable doubt is that the defendant participated in the scheme to defraud with the intent to defraud.

To act with "intent to defraud" means to act knowingly and with the intent to deceive someone for the purpose of causing some financial loss to another or bringing about some financial gain to oneself or another to the detriment of a third party. With respect to false statements, the defendant must have known the statement was untrue when made or have made the statement with reckless indifference to its truth or falsity.

### 39. WIRE FRAUD ELEMENT THREE

The third element that the prosecution must prove beyond a reasonable doubt is that the defendant used, or caused to be used, an interstate wire communication in furtherance of, or in an attempt to carry out, some essential step in the scheme to defraud.

An interstate wire communication is a wire communication that crosses a state line. A "wire communication" includes telephone calls, electronic signals sent by wire (such as a fax or a financial wire), the use of the Internet to send a message (such as an e-mail), and communicating with a website via the Internet.

It is not necessary that the defendant himself or herself contemplate the use of a wire communication or that the defendant send or receive the actual wire communication or specifically intend that a wire communication be used. It is sufficient if a wire communication was in fact used to carry out the scheme and the use of a wire communication by someone was reasonably foreseeable. Wire communications that are designed to lull victims into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are communications in furtherance of the scheme.

It is not necessary that the prosecution prove all the details alleged in the Indictment concerning the precise nature and purpose of the scheme, that the interstate wire communication was itself false or fraudulent, that the alleged scheme actually succeeded in defrauding anyone, or that the use of the interstate wire communication was intended as the specific or exclusive means of accomplishing the alleged fraud.

Each separate interstate wire communication in furtherance of the scheme to defraud constitutes a separate offense.

## 40. TELEMARKETING

In order to find that a wire fraud offense involved "telemarketing," you must find that the offense involved a plan, program, promotion, or campaign that was conducted to induce purchases of goods or services. Either the person conducting the plan, program, promotion or campaign or a prospective purchaser, participant, or contributor must have used at least one interstate telephone call during the offense.

Telemarketing does not include the solicitation of sales through the mailing of a catalog or brochure that contains a written description or illustration of the goods or services offered for sales, includes the business address of the seller, includes multiple pages of written material or illustrations, and has been issued not less frequently than once a year, as long as the person making the solicitation does not solicit customers by telephone. The person making the solicitation can only receive calls initiated by customers in response to the catalog and during those calls take orders without further solicitation.

## 41. WILLFUL BLINDNESS

You may find that a defendant acted knowingly if you find beyond a reasonable doubt that they believed there was a high probability that a certain fact or set of facts existed, and that they took deliberate actions to avoid learning of those facts. Knowledge may be inferred if the defendant deliberately closed their eyes to what would otherwise have been obvious to him or her. A willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. You may not find a defendant acted "knowingly" if you find he or she was merely negligent, careless, or mistaken as to the facts in question.

## 42. GOOD FAITH

Good faith is a complete defense to the crimes of mail fraud, wire fraud, and conspiracy to commit mail fraud if the defendants did not act with the intent to defraud, which is an element of the charges. The essence of the good faith defense is that one who acts with honest intentions cannot be convicted of a crime requiring fraudulent intent.

Good faith includes, among other things, an opinion or belief that is honestly held, even if the opinion is in error or the belief is mistaken. However, even though a defendant honestly held a certain opinion or belief, a defendant does not act in good faith if he or she also knowingly made false or fraudulent representations or promises, or otherwise acted with the intent to defraud or deceive another. Proof of fraudulent intent requires more than proof that a defendant only made a mistake in judgment or management, or was careless.

The prosecution has the burden of proving beyond a reasonable doubt that the defendants acted with the intent to defraud. Evidence that the defendants acted in good faith may be considered by you, together with all the other evidence, in determining whether or not the defendants acted with the requisite intent.

## 43. AMONDO MILLER'S THEORY OF DEFENSE

Mr. Miller has pleaded not guilty to the Indictment because (1) he had no knowledge of the nationwide conspiracy alleged in the Indictment, (2) he did not knowingly agree to participate in the conspiracy, (3) he did not knowingly take any action to further this scheme, and (4) he acted in good faith with no intent to defraud anyone.

Mr. Miller states that he was not the owner of Magazine Solutions and his work on behalf of Magazine Solutions did not require or involve knowledge of the alleged conspiracy or scheme. Mr. Miller worked on behalf of Magazine Solutions with the honestly held belief that its business practices were legitimate and lawful. He did not knowingly take any action to further any fraudulent scheme. In addition, Mr. Miller was the owner of Power Sales & Marketing and was a broker of lead lists. When Mr. Miller sold leads to other individuals, he did not know that these individuals would use the leads to commit a crime or sell or share them with others to commit a crime. Mr. Miller had no control over what other individuals did with his leads once he sold them. Mr. Miller had no knowledge of the way other companies conducted their magazine subscription sales. Mr. Miller did not know or associate with most of the co-defendants or other alleged conspirators and, for those he did interact with, he did so in arms-length transactions that involved minimal communication regarding the quantity and price of leads. Mr. Miller acted in good faith when doing any work on behalf of Magazine Solutions and Power Sales & Marketing, even if, with the benefit of hindsight, Mr. Miller made an honest mistake in judgment. Because Mr. Miller acted in good faith and with honest intentions, he cannot be convicted of a crime requiring fraudulent intent.

## 44. TASHENA CRUMP'S THEORY OF DEFENSE

Ms. Crump performed her job at Readers Club Home Office with an honestly held belief that she was hired by and promoted within the ranks of a legitimate business. She was invested in the success of that business as well as the happiness of the customers she aimed to serve. Ms. Crump intended to perform her job to the best of her ability and abide by all lawful obligations. In other words, Ms. Crump acted in good faith, even if, with the benefit of hindsight, she made an honest mistake in judgment or an error in management. Acting in good faith is a complete defense to the charges against Ms. Crump because one who acts with honest intentions cannot be convicted of a crime requiring fraudulent intent.

Additionally, Ms. Crump did not knowingly join any part of the nationwide telemarketing-fraud alleged in the Indictment. That Ms. Crump worked for and associated with Brian Williams does not prove she joined the nationwide conspiracy alleged in the Indictment. To the contrary, the evidence has shown that Ms. Crump's employer, Brian Williams, actively sought to keep her in the dark and ensured that she: (1) had no knowledge of the alleged nationwide conspiracy that Brian Williams participated in; and (2) did not knowingly participate in and join any such conspiracy.

## 45. BALLAM DUDLEY'S THEORY OF DEFENSE

Defendant Dudley has pleaded not guilty to the Indictment, and he asserts in his defense that he did not agree to participate in the nationwide conspiracy alleged in the Indictment, had no knowledge of the scheme alleged in the Indictment, and otherwise acted in good faith without an intent to defraud.  Mr. Dudley states that he was a lower-level telemarketer whose work duties did not require or rely upon knowledge of the alleged conspiracy or scheme.  He asserts that he did not associate with any of the co-defendants or other alleged conspirators; was not an owner, manager, or supervisor of any magazine business; was not involved in the acquisition of lead lists from brokers; and did not share in the profits of any magazine business.  Moreover, Mr. Dudley states that, as an ex-offender, he acted with the intent to maintain employment and remain law-abiding.

## 46. FINAL INSTRUCTIONS

In conducting your deliberations and returning your verdict, there are certain rules you must follow.

*First*, when you go to the jury room, you must select one of your members as your foreperson. That person will preside over your deliberations.

*Second*, it is your duty, as jurors, to discuss this case with one another in the jury room.  You should try to reach agreement if you can do so without infringing on individual judgment, because a verdict – whether guilty or not guilty – must be unanimous.

Each of you must make your own conscientious decision, but only after you have considered all the evidence, discussed it fully with your fellow jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinions if the discussion persuades you that you should.  But do not change your opinion simply because other jurors think it is right, or simply in order to reach a verdict.

*Third*, if a defendant or the defendants are found guilty, the sentence to be imposed is the Court's responsibility.  You may not consider possible punishment in any way in deciding whether the prosecution has proven its case beyond a reasonable doubt.

*Fourth*, if you need to communicate with the Court during your deliberations, you may send a note to me through the marshal, signed by one or more jurors.  The Court will respond as soon as possible in writing.  Remember that you should not tell anyone during your deliberations—including the Court—how the jury stands, numerically or otherwise,

on the question of whether the prosecution has sustained its burden of proof until after you have reached a unanimous verdict.

*Fifth*, your verdict must be based solely on the evidence and on the law which the Court has given to you in these instructions.  Nothing the Court has said or done is intended to suggest what your verdict should be – that is entirely for you to decide.

*Finally*, the verdict form is simply the written notice of the decision that you reach in this case.  You will take this form to the jury room, and when each of you has agreed on the verdict, your foreperson will fill in the form, sign and date it, and advise the marshal that you are ready to return to the courtroom.