**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Criminal No. 20-CR-232 (35) JRT/DTS |
| Plaintiff, | |
| | **DEFENDANT** |
| v. | **BALLAM HEZEAKIAH DUDLEY'S** |
| | **POSITION REGARDING** |
| Ballam Hezeakiah Dudley, | **SENTENCING** |
| Defendant. | |

## INTRODUCTION

Defendant Ballam Hezeakiah Dudley urges this Court to sentence him to time served. He acknowledges his mistakes as an employee of Central Subscription Services and West Side Readerz (together herein "West Side"), and he regrets the financial hardships caused by his conduct as a telemarketer there. Dudley hopes that the Court understands his circumstances as an ex-offender that pressed him to work at West Side; recognizes his efforts during the last ten years to break away from his criminal past; and fashions a sentence that fosters his ambitions to pursue lawful and productive employment in the automotive sector. A time served sentence would also be consistent with the Court's treatment of other telemarketers in this case, whose roles in the magazine subscription companies—as conceded by the Government—were minimal and subordinate to the masterminds, managers, and profiteers of the fraudulent scheme.

## I.     FACTUAL BACKGROUND

### A.     Dudley's family, education and employment.

Ballam Hezeakiah Dudley, a Black male, was born on February 25, 1986, in Minneapolis. Dudley is the only child of Dr. William N. Dudley and Terri Dudley (both Black); each of his parents had a prior marriage but no other children. They later divorced when Dudley was 13. Both parents were born and grew up in the South under Jim Crow segregation. Dudley's father (age 91), the first licensed Black veterinarian in Minnesota, now lives in a modest, older home in Plymouth. His mother (age 71) was a flight attendant with Northwest Airlines before leaving her job to raise her son.

The elder Dudley also owned commercial property in Brooklyn Center where he leased space to an auto mechanic. As a youngster, Dudley spent time after school in his father's clinic and frequented the adjoining mechanic's garage where he developed his interest in automobiles. The elder Dudley involved his son in many activities, and instilled in him the importance of education and hard work as the prerequisites to financial success.

Dudley attended elementary and secondary school in Robbinsdale and graduated from Armstrong High School in 2004. He enrolled at North Dakota State College of Science in Wahpeton for one year, and then transferred to North Dakota State University in Fargo for his sophomore and junior years. Dudley did not complete college; he became distracted by his use of marijuana which started in high school. At NDSU, he was first arrested for marijuana possession off campus. He transferred to Minnesota State University Moorhead, but while there, he was arrested in Douglas County for possessing three pounds of marijuana. Dudley later enrolled at Hennepin County Community College

2

for two semesters, but was arrested again in North Dakota for possessing three pounds of marijuana.  Dudley sold marijuana to repay a debt to another supplier and later to supplement his ability to buy and smoke it, but "it ended up kind of just snowballing after that."

Dudley never secured a full-time job initially because he was encouraged by his father to complete college.  However, his drug-related activities interrupted his education and became obstacles to employment.  "I guess in some ways I've always had to just be hustling from either mowing lawns and plowing or doing some property management with some people.  And they could never put me on the payroll."  Dudley earned sporadic income by performing work for his father (e.g., accounting and irrigation projects) and had several jobs in construction, property management, and retail sales (e.g., at Abercrombie Fitch clothing stores at Rosedale and Ridgedale malls).  But as a Black male ex-offender, his record of drug offenses became an obstacle to full-time employment.

As a result, Dudley continued to resort to self-employment.  In recent years, Dudley worked at ASAP Automotives, an auto mechanics shop in Fayetteville, Arkansas.  Dudley is also a self-employed auto dealer; he is an owner and operator of 612 Auto Sales, LLC, an automobile dealership he incorporated in February 2019 in Minnesota.  His business— based upon the Carvana model—is to identify customers in need of reliable, affordable cars and then to locate and deliver the cars directly to the customers.

**B.      Involvement with magazine subscription sales.**

Dudley began working as a magazine telemarketer in 2010, when he was introduced to West Side by Andrew Landsem, a friend since childhood.  At the time, Dudley was

performing roofing work for a subcontractor, but his probation officer insisted that he obtain W-2 employment.  Dudley had no prior experience in telemarketing, magazine sales, or employment in a commercial office.  But he was comfortable working at West Side because he saw familiar faces there and the work kept him out of trouble.  Dudley also needed money, and his probation required that he maintain a steady job in a structured setting "with a boss."  Dudley's long-term professional interest remains with automobiles. "West Side was a part-time thing for me.  I was really chasing other things, because telemarketing is something that I have no passion for."

Dudley first met Jared Michelizzi three months after Dudley started at West Side, and discovered later that Michelizzi owned the business.  Dudley started as a salesperson making the opening calls to magazine customers.  But later, after the departure of West Side' leading closer Daniel Kallhof in 2018, Dudley, became a closer responsible for engaging the customer—using a standard script prepared by Michelizzi—to confirm a sale with a credit card charge.  He worked there about 20 hours per week, earning $13/hour and a commission of $5 per sale.  During the years 2012 through 2019, Dudley's wage and commission income was as follows:

| Year | Gross Income |
|------|-------------|
| 2012 | 14,776.37 |
| 2013 | 11,368.75 |
| 2014 | 578.50 |
| 2015 | 6,644.25 |
| 2016 | 21,071.00 |
| 2017 | 30,156.00 |
| 2018 | 40,194.25 |
| 2019 | 23,058.52 |
| **Total** | **147,847.64** |

4

*See* Trial Exhibits Dudley-011 through Dudley-018.   By comparison, Kallhof earned $585,288.66 between 2012 and his departure in 2018.

In March 2013 while at West Side, Dudley was arrested for selling three grams of cocaine to a confidential informant in September and October 2012, leading to his third felony conviction resulting in a 14-month incarceration at MCF-Faribault.   After release, Dudley continued to seek full-time employment, but his criminal record remained a problem.   For example, his application to work at a Target distribution center was denied after a background check; the recency of his criminal convictions barred his hire.   But he was welcomed back at West Side.   Dudley also worked briefly (during a 2016 vacation) for another Michelizzi-owned magazine company in San Diego, Pacific Beach Club Readers.   In September 2018, Dudley moved to Fayetteville to live with his fiancé Ali McEntire, who was also employed by West Side and worked alongside Dudley remotely.[1]

### C.    Pending federal criminal proceeding.

This criminal action commenced in October 2020 with a 53-count indictment charging Dudley and 42 other defendants with a single, nationwide conspiracy to commit mail fraud in the telemarketing of magazine subscriptions.   The Indictment alleged that Dudley's role was that of a telemarketer only, conducting sales for West Side from the Fridley call center and his home in Fayetteville.   There is no allegation that Dudley was

---

[1] McEntire met Dudley several years ago at a music festival in Arkansas.   With Dudley's help and support, McEntire has successfully pursued her real estate broker licensure.   Although the pending proceeding has disrupted the couple's relationship, McEntire has submitted a letter to the Court on Dudley's behalf.

4854-5760-5063.1

involved with any other company or interacted with any other defendant beyond those associated with West Side.

During the relevant time period, West Side employed more than 350 individuals, the vast majority of them as telemarketers who engaged in substantially similar conduct to Dudley: calling a pre-made lead list and reading from a standardized sales script.  Of this sizeable workforce, the Government elected to indict Dudley because he was recorded three times on audiotaped telephone calls confirming magazine subscriptions with Government undercover agents.  There was no evidence demonstrating that Dudley held any ownership, managerial, or supervisory role at West Side, or that he received any financial profit beyond his hourly wage and commissions.

Dudley rejected pretrial plea agreement offers from the Government, the last of which recommended a sentence of time served.  Instead, he stood trial last fall and testified in his own defense.  The jury returned verdicts on November 4, 2023, finding Dudley guilty of Count 1 (conspiracy to commit mail fraud), Count 6 (mail fraud), and Counts 23 and 41 (wire fraud).  Dudley's Presentence Investigation Report ("PSR" or "Report") has been completed and he now awaits sentencing scheduled for July 1, 2024.

Amplifying the remorse that he expressed at trial (Trial Transcript ("Tr."), Vol. XVI at 3724), Dudley has accepted responsibility for his conduct and the financial harm that it caused (PSR at ¶116):

> I am very sorry for the harm caused by my work as a telemarketer for Jared Michelizzi's magazine companies.  As I testified at trial, I feel terrible that my conduct caused financial hardship and pain to so many people.  I regret it and accept responsibility for it.  I was one of many telemarketers who worked for Michelizzi.  I read the script that I was provided when talking

6

to the customers whose names he provided to me.  At trial, I learned about the wider scheme among magazine company owners and lead brokers that resulted in millions of dollars taken by fraud.  I did not profit from this scheme beyond the modest wages and commissions I earned from calling customers.  I am angry that I was used to facilitate this fraud.  In hindsight, I wish that I had asked more questions or that someone would have told me what was really happening.  I would never have knowingly chosen to work for a company that hurt so many people.  I was working hard to turn my life around, and I am still committed to being a productive and law-abiding member of society.

## II.    OBJECTIONS TO THE GUIDELINE CALCULATION

### A.    Offense level and loss calculation.

Dudley objects to the Report's §2B1.1 loss calculation of $7,355,126.  This amount substantially overstates the amount of loss attributable to Dudley because it includes transactions conducted by Michelizzi's Minnesota-based companies in which Dudley had no involvement.  Dudley should not be sentenced based on losses he did not cause.

The Court should look to amounts actually paid by consumers when determining the appropriate amount of loss for its sentencing calculation.  USSG §2B1.1 Application Note 3(A)(iv) defines "reasonably foreseeable pecuniary harm" as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  The district court should "not automatically hold an individual defendant responsible for losses attributable to the entire conspiracy, but rather must identify the loss that fell within the scope of the defendant's agreement with his co-conspirators and was reasonably foreseeable to the defendant." *United States v. Treadwell*, 593 F.3d 990, 1002 (9th Cir. 2010).  As the Ninth Circuit explained:

> Knowledge of "another participant's criminal acts is not enough to hold the defendant responsible for those acts," *United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995), and knowledge of a conspiracy's overall objectives does not make the defendant accountable for all the coconspirators' acts furthering those objectives.   In the telemarketing context, "the scope of a joint undertaking for sentencing purposes depend[s] on whether the telemarketers 'worked together,' 'relied on one another to make a sale,' attended the same sales meetings, and 'depended on the success of . . . the operation as a whole for their financial compensation.'"   *Treadwell*, 593 F.3d at 1005 (*quoting Blitz*, 151 F.3d at 1013).

*United States v. Lloyd*, 807 F.3d 1128, 1142-43 (9th Cir. 2015).

In *Lloyd*, the court concluded that a telemarketer should not be liable for fraudulent sales made by a coconspirator because he did not design or develop the overall scheme, did not pool resources with the other boiler-room, and did not share proceeds with the other boiler-room.  807 F.3d at 1144-1145.  The court analogized it to the example given in the Illustrations to §1B1.3:

> [A] dealer who sells to his own customers, in his own territory, and does not share information, other resources, or profits with other dealers who have their own territories and customers, is not engaged in jointly undertaken drug dealing with the other dealers and is not accountable for the drugs they sell. That is true even if the first dealer knows about the other dealers and who they are and knows that the drugs come from the same supplier.  Similarly, even if the first street-level drug dealer knows that the person who recruited him to sell drugs also recruited the other dealers for the same purpose, the first dealer is generally accountable only for the drugs he sells. §1B1.3, comment. n.2, Illustration (c)(7)."

*Lloyd*, 807 F.3d at 1142.

The same is true here.  Dudley did not design the telemarketing scheme.  He did not have contact with anyone in the conspiracy outside of the company where he was employed.  He did not share information or resources with anyone; he used the scripts and leads he was provided by his employer to do his job.  He did not write the scripts or procure

8

leads.  He did not supervise or train his coworkers.  He did not share profits with his employer, let alone his coworkers or other alleged members of the conspiracy.  He was paid an hourly wage.  Sales completed by others were not reasonably foreseeable to Dudley, and he should not be attributed a loss amount that he could not have foreseen or controlled.

Moreover, Dudley was one of more than 350 people who worked for one of Michelizzi's companies at some point over the years.  (Tr., Vol. X at 2128; Trial Exh. Dudley-021.)  The amount of loss attributable to Dudley should not include sales made by anyone other than himself.  The PSR's §2B1.1 loss amount would hold him responsible for the sales conducted by hundreds of other employees, nearly all of whom were not charged in the case.

Instead, the maximum loss amount the Court should apply is the paid on contract amounts received by Michelizzi's Minnesota-based companies for transactions in which Dudley was a salesperson, closer, or verifier.  That total is $1,347,319.38, which is based on sales transaction data recorded on PSOnline and admitted at trial by the Government as Exhibits P020a and P020e:

| Trial Exh. No. | Amount Paid |
|---|---|
| P020a (1) | 138,761.75 |
| P020a (2) | 275,121.18 |
| P020a (3) | 933,008.05 |
| P020a (4) | - |
| P020e | 428.40 |
| **Total** | **1,347,319.38** |

4854-5760-5063.1

(*See* ECF 2211-6, Lewis Dec., Exh. E (Declaration of Sarah Didrickson).)  This is the maximum amount of loss which could be attributed to conduct by Dudley.

**B.     Role in offense adjustment.**

The §3B1.2 adjustment for the role in the offense should be adjusted further downward to a 4-level increase as Dudley was a *minimal* participant.  The commentary to §3B1.2(a) describes a minimal participant:

> Subsection (a) applies to a defendant described in Application Note 3(A) who plays a minimal role in concerted activity.  It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group.  Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.

USSG §3B1.2, comment (n.4).  The commentary to the guideline also provides a list of five factors to be considered in determining the amount of the mitigating role adjustment:

> (i)     the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii)    the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii)   the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v)     the degree to which the defendant stood to benefit from the criminal activity.

USSG §3B1.2, comment (n.3(C)); *see United States v. Rodriquez*, 44 F.4th 1229, 1234-37 (9th Cir. 2023)(applying five factors).

Application of the above factors demonstrates that Dudley was a minimal participant deserving a full mitigating adjustment.  Dudley's role was solely as a

telemarketer for Michelizzi's Minneapolis-based companies, and the evidence failed to demonstrate his knowledge of any scheme beyond his job function.  Nor did the Government prove any association between Dudley and other owners or lead brokers beyond Michelizzi.  Dudley certainly was not involved in the planning or organization of the scheme, and he did not exercise in decision-making or management.  Likewise, Dudley—in simply calling customers from scripts supplied by his employer—had no authority and exercised no discretion in performing his job duties.  Finally, Dudley had no proprietary interest in the profits from the magazine fraud scheme; he worked for an hourly wage and commissions while his co-defendants made millions.

## III.   GROUNDS FOR DEPARTURE FROM THE GUIDELINES

### A.   The offense level substantially overstates the seriousness of Dudley's offense.

The PSR adopted the Government's proposed loss figure of $7,355,126. (PSR at ¶108.)  As the Report noted, however, this figure may overstate the loss caused by Dudley's conduct:

> Pursuant to USSG §2B1.1, comment. (n.21(C)), there may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases, a downward departure may be warranted.  An example is provided of a case with "substantial but diffuse" aggregate loss amount, where "relatively small loss amounts suffered by a relatively large number of victims…may combine to produce an offense level that substantially overstates the seriousness of the offense."  While not perfectly aligned with the circumstances in this case, the undersigned would note that, while the government contends the loss amount is greater than $3,500,000, which resulted in an 18-level increase for loss as well as 6 levels of victim enhancements, the government and several defendants in this case with comparable involvement agreed to restitution amounts of $100,000 or less.  If the Court believed this combination of loss and victim enhancements substantially overstated the seriousness of the offense and considered a

11

$100,000 loss amount as a more commensurate representation of Dudley's culpability under this departure provision, the resulting departure range would be 57 to 71 months (total offense level of 19, based on an 8-level loss enhancement instead of 18, and criminal history category V).

(PSR at ¶ 217.)   A loss calculation based on Dudley's sales of $1,347,319.38—which would result in a 14-level increase under § 2B1.1(b)(1)(H)—also grossly overstates Dudley's role and the seriousness of his conduct.

Although the overall conspiracy caused significant loss to many people over many years and resulted in substantial earnings, those earnings were isolated to the company owners and lead brokers.  Michelizzi made millions off the scheme he helped orchestrate; Dudley made a modest hourly wage and commissions.   Dudley earned a total of $147,847.64 during his last eight years at West Side.  *See* discussion *supra.*  He did not reap significant profits off fraudulent magazine sales, and thus should not be charged with a loss amount suggesting he did.  *See United States v. Huber,* 462 F.3d 945, 952 (8th Cir. 2006) (affirming district court's downward departure on loss amount calculation based on relatively small net profits gained from money laundering scheme).

Accordingly, Dudley asks the Court to depart from the guideline calculation and accept the alternate calculation of $100,000 proposed in the Report at paragraph 217.  As noted, this case reasonably falls within the confines of §2B1.1, comment n.21.(C), which explains:

> There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases, a downward departure may be warranted.

12

For example, a securities fraud involving a fraudulent statement made publicly to the market may produce an aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims.  In such a case, the loss table in subsection (b)(1) and the victims table in subsection (b)(2) may combine to produce an offense level that substantially overstates the seriousness of the offense.  If so, a downward departure may be warranted.

Dudley was a telemarketer.  Using scripts prepared and provided to him by Michelizzi, Dudley called customers derived from lead lists compiled or purchased by Michelizzi outside of Dudley's knowledge.  While Michelizzi and others in the scheme earned millions from their fraud, Dudley made comparatively little.  While some victims admittedly incurred thousands of dollars in losses due to the fraudulent sales from many companies, Dudley was not responsible for thousands of dollars in fraudulent sales to any one customer.  (*See, e.g.*, Trial Exhs. A009, A010 showing sales to Jonathan Petersen attributable to Dudley of $717.60 out of $23,004.57; Trial Exhs. A013, A014, P021a p. 17 showing Dudley was the opener for $1,196.00 of the $27,833.47 in sales to Joseph Leahy, while Kallhof, who was not charged, was the closer; Trial Exhs. A016, A017 showing Dudley was responsible for zero of the $60,078.58 in sales to Penny Mashburn; Trial Exhs. A022, A023 showing Dudley was involved in $1,166.20 of $29,180.84 in sales to Phyllis Schreier.)  This is precisely the sort of diffuse loss resulting in relatively small amounts to multiple victims that warrants a downward departure.

A reduced loss amount is also reasonably supported by the evidence.  Trial Exhibits P21 and P21a identified each initial order transaction in which Dudley was the salesperson, closer, or verifier.  The total for the transactions identified in those spreadsheets is $181,317.  (*See* ECF 2211-6, Lewis Dec., Exh. E at ¶2 (Didrikson).)

13

Based on the reduced loss amount between $95,000 - $150,000, Dudley requests that the Court apply §2B1.1(b)(1)(F) and conclude that the level increase should not exceed 10 levels, resulting in a base offense level of 19.

**B.     Criminal History Category V substantially over-represents the seriousness of Dudley's criminal history or the likelihood that he will commit other crimes.**

Although Dudley's criminal history is extended, it is modest in substance and characterized by street-level drug-related offenses that reveal no propensity to violence or fraud.

USSG §4A1.3(b)(1) states:

STANDARD FOR DOWNWARD DEPARTURE: If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

In the context of *upward* departures, the Guidelines note that the *nature*, and not the sheer *number* of prior offenses may be more indicative of the seriousness of the defendant's criminal record.  *See* USSG §4A1.3, comment. (n.2(B).  The Court should likewise evaluate the nature of Dudley's prior convictions in assessing whether to depart downward.

Such an assessment, as noted in the PSR, reveals that Dudley's criminal history principally involved the possession and sale of marijuana, resulting in two misdemeanor and two felony convictions.  A third felony conviction in 2014 was the result of the sale in fall 2012 of a small quantity of cocaine to an informant (3 grams of cocaine for $240), and it is the only conviction that resulted in a significant custodial sentence (Dudley served 14 months of a 24-month sentence).  None involved the threat or use of violence or a firearm.

Notably, until this federal proceeding, Dudley had never been charged with an offense involving fraud or dishonesty.

The November 2023 amendment to the Commentary to USSG §4A1.3 states that a downward departure may be warranted when the defendant received criminal history points for possession of marijuana for personal use. USSG §4A1.3, comment. (n.3(A)(ii)). Dudley's 2005 and 2006 misdemeanor convictions in North Dakota—while Dudley was a college student there—fall into this category. Moreover, had these offenses occurred in Minnesota, they would have likely been automatically expunged as part of the state legislature's 2023 decriminalization of recreational cannabis use. *See* Minn. Stat. 609A.055, subd. 1. Similarly, the impact of Dudley's 2008 Dakota County conviction under Minn. Stat. 152.025, subd. 2 may be eligible for review and expungement by the Cannabis Expungement Board. *See* Minn. Stat. 609A.06, subd. 3. These marijuana convictions account for 4 of Dudley's 12 Criminal History points.

At bottom, the Category V Criminal History score over-states the likelihood that Dudley would re-offend. Dudley's last state criminal conduct occurred more than 12 years ago when he was 26. The federal conspiracy and fraud offenses for which he will be sentenced are one-off aberrations as he has no prior history of business misconduct or dishonesty. Nothing in his criminal record indicates that Dudley is an obvious and growing danger to society. As the PSR suggests, the Criminal History score should be discounted and a departure under USSG §4A1.3(b)(1) granted.

## IV.   SECTION 3553(a) FACTORS AND GROUNDS FOR VARIANCE

### A.   The nature and circumstances of the offense (3553(a)(1)).

As explained above in Dudley's request for a further USSG §3B1.2 mitigating role adjustment, Dudley was not a driving force of the fraud.  He was among the lower-level telemarketers who read scripts from an office cubicle with little knowledge of the scope of the scheme into which they were recruited.   To admittedly plagiarize from the Government's own language in its position statements for other minor participants (here that of Kiley Marie Saindon, ECF No. 2064 at 5-6):

> At the same time, [Dudley] played only a small part in a large-scale fraud. [Dudley] did not own or found [West Side Readerz].  What little administrative role [he] played at the company amounted to not much more than being the longest tenured telemarketer around.  [He] did not develop the fraud scheme or write or edit the fraudulent scripts.  [He] was not actively involved in obtaining or trading lead lists.  [He] did not meet with or trade tips with managers or owners at other companies.  [He] did not actively respond to Better Business Bureau, Attorneys General, or other consumer complaints.  Nor did [Dudley] get rich participating in the scheme—[he] was only paid a small, hourly wage for [his] work.

The Government has acknowledged that, to a significant extent, the owners who formed and operated the companies that perpetrated the nationwide fraud scheme preyed on ex-offenders to staff the call centers.  Telemarketing is a difficult and unattractive job, and the owners were open to recruiting individuals who—because of lack of education, criminal histories, or substance abuse issues—were otherwise unemployable.  It was a job of last resort.  *See United States v. Ivory Denise Alexander* (No. 20-231(4) D. Minn. Nov. 22, 2022)(ECF No. 270 at 14-15)("Alexander Sentencing").  That was certainly the

case for Dudley.  Michelizzi hired Dudley and others with criminal backgrounds, knowing

that their other employment options were limited.  (*See* Tr. Vol. X at 2144-2145.)

Michelizzi shared little information about the business with Dudley, and the

surroundings gave Dudley and other telemarketers a false sense of security.  Again, to

paraphrase from the Government's position statement for co-defendant Tara Nichole

Creason:

> [T]he fact that the companies [he] worked for operated an office and call
> center where numerous other telemarketers also worked provided an air
> of legitimacy to an illegitimate, fraudulent company.  In many ways, this
> allowed the companies to recruit otherwise well-intentioned individuals
> like [Dudley], who were merely seeking a paycheck, into the fraudulent
> work.  This is not an excuse for [Dudley's] conduct, although it helps
> explain how [he] became involved in it in the first place.

(ECF No. 1545 at 5.)  Indeed, at trial, Dudley testified about the comfort he took in working

for the first time in a commercial office building.  (Tr. Vol. XVI at 3685-86.)

Telemarketing was never Dudley's career objective.  But Dudley was keen on

earning a living.  West Side was a convenient, part-time employer of last resort which

offered a paycheck when most other employers refused opportunities to ex-offenders (most

often Black males).  Because Dudley was articulate and a good, friendly communicator, he

could successfully engage with customers on the phone.  West Side provided a steady job

while Dudley was trying to turn his life around, and they welcomed him back even after he

was released from prison in 2014 after his third felony conviction.

Dudley's probation officer Daniel Nowack testified at trial regarding Dudley's

history on probation.  He described some parolees actively trying to avoid gainful

employment—not showing up for interviews, not taking the process seriously, not dressing

4854-5760-5063.1

or acting professionally.  (Tr. Vol. XVI at 3645-3646.)  In contrast, his notes regarding Dudley indicated that Dudley was doing multiple things for work:  working for a lawn and garden company, part-time sales at the magazine company, some lawn mowing, some snow plowing.  (*Id*. at 3647; Trial Exh. Dudley-024 at 5.)  In fact, he was working so much that Nowack encouraged him to scale back so he was less stressed.  (*Id.*)  As a result, Dudley focused on work for the magazine company, where he had a boss and a regular schedule. In a cruel twist of irony and bad luck, it was Dudley's work ethic that led him to take a December 2019 holiday shift at West Side, only to pick up the phone to speak with an undercover agent that led to his prosecution and conviction here.

### B.    The history and circumstances of the defendant (3553(a)(1).

Dudley grew up in a Twin Cities household with educated parents who clashed, among other things, over their different visions for their son's upbringing.  After his parents divorced, Dudley lived primarily with his father, who valued hard work, higher education, and financial security.  Dudley initially pursued college, but his penchant for marijuana caused him to flounder in class, and he resorted to marijuana sales to pay off a debt and support himself financially.   Subsequent drug-related arrests interrupted his college education and eventually interfered with his ability to obtain full-time employment, housing, and a stable living environment.  As he navigated the criminal justice system, Dudley was receptive to substance abuse and mental health counseling and treatment.

Dudley clearly wants to pursue a livelihood working with automobiles.  During his last stint in prison, he read books on financial literacy.  He formed his own auto business, 612 Auto Sales, where he demonstrated acumen in developing financial credit and

18

customer relations.  During his pretrial release in this matter, he was employed in Fayetteville at ASAP Automotive Services as a service writer and mechanic.  He describes his work there as a "labor of love," enabling him to learn more about cars and the auto business.

Those who know Dudley acknowledge his past mistakes, but recognize that he has persevered and matured to become a reliable and responsible adult committed to helping others.  Customers, friends, and family members describe him as smart, kind, hard-working, and supportive.  Notably, his fiancé McEntire—whose relationship with Dudley has suffered as a result of his involvement in this criminal proceeding—describes him as "a rare gem in this world" who made "an indelible impact on my life, guiding and inspiring me in ways I never imagined."

### C.   The seriousness of the offense and just punishment for it (3553(a)(2)(A).

Dudley does not dispute that "there was a nationwide conspiracy to defraud hundreds of thousands of victims out of hundreds of millions of dollars for fraudulent magazine subscriptions."  (*See* ECF No. 2307 at 4-5 (order on post-trial motions).)  He simply asserts here that the Government has already satisfied the public interest and achieved justice for the fraud victims.  The Government has emphasized that its chief goal in the investigation and prosecution of dozens of defendants was to shut down the companies, end the scheme, and deter others from engaging in further fraudulent sales.  (*See* Alexander Sentencing (ECF No. 270 at 8-13).)  The Government also conceded that the guideline ranges, driven disproportionately by the §2B1.1 loss amount, should not be the primary factor in sentencing individual defendants.  (*Id.* at 13.)  Finally, the

Government acknowledged the subordinate role of the telemarketers—whose educational and economic disadvantages drove them to employment by the companies—was a mitigating circumstance.  (*Id.* at 14-15.)  Even under the Government's own criteria, a harsh punishment of Dudley is not necessary to achieve justice in this case.  Nor does making Dudley "an example" further any deterrence objective.

### D.    Protection of the public from further crimes of the defendant (3553(a)(2)(C).

Although Dudley has several drug-related convictions, nothing in his record reveals a propensity for violence.  Nor is there evidence of past crimes involving theft, fraud, or dishonesty prior to the instant offense.  Dudley's third and last felony conviction arose from a drug sale in October 2012, nearly 12 years ago.  He appears to be "aging out" of his prior pattern of drug offenses.  Moreover, during the nearly five years since his indictment in this case, Dudley has substantially complied with his pretrial release conditions.  He has remained in contact with his probation officers and demonstrated post-trial rehabilitation efforts, including counseling and group meetings, designed to remain law abiding. Decidedly, Dudley is not a threat to the public.

### E.    The need for educational or vocational training, medical care, or other correctional treatment (3553(a)(2)(D)).

As noted in the PSR (at ¶225), Dudley will certainly need additional training, counseling and advice to secure and maintain meaningful full-time employment. Moreover, his conviction for a felony involving fraud and dishonesty now presents a major—perhaps, in the short term, insurmountable—barrier in his quest for success in a

business sector that requires access to capital. Additional education in advanced financial literacy will be necessary for Dudley to regain credit and trust.

To cope with post-trial stressors that impact his mental wellbeing and potential vulnerability to substance abuse, Dudley has regularly attended "The Mens Group," a support group for Black male ex-offenders founded by Ramsey County District Judge George Stephenson. Continued participation in this support network will guide him toward a positive trajectory. Dudley is also receptive to other treatment and counseling options that the Court finds necessary as a condition of supervision.

### F.    The kinds of sentences available (3553(a)(3)).

Although a sentence of straight probation in this case is barred by statute and USSG §5B1.1, Dudley is as eligible as other co-defendants for a "time served" sentence. Indeed, this was the disposition previously offered by the Government in exchange for a change of plea. (*See* ECF No. 1889 at 85-86 (pretrial motion hearing).) A wide range of conditions under supervised release would still be available to the Court that would promote Dudley's need for vocational growth and stability. While awaiting trial for nearly five years, Dudley has already remained effectively and successfully under court supervision.

### G.    The sentencing range for the applicable categories of offense and defendant (3553(a)(5)).

Dudley has moved for downward departures from the Guidelines sentencing range pursuant to USSG §§2B1.1, comment (n.21(C) and 4A1.3(b)(1). The grounds for the motion are stated in Section III *supra*.

### H.     The need to avoid unwarranted sentence disparities among defendants (3553(a)(6)).

Consideration of the Court's prior sentences of co-defendants in this action, although not mandated by §3553(a)(6), is still appropriate to avoid extreme disparities between similarly-situated co-conspirators. *See United States v. Merrett*, 8 F.4th 743, 753-54 (8th Cir. 2021).   The Government's recommendations, and the Court's sentences imposed to date in this proceeding, have been markedly downward from the those suggested by the Guidelines and included time-served sentences for the telemarketers:

| Defendant | Role | Guideline Range[2] | Sentence |
|---|---|---|---|
| Creason, Tara | Manager | 110-137 months | Time served[3] |
| McGarrity, Eric | Telemarketer | 151-188 months | Time served[4] |
| Mendizabal, Luis | Telemarketer | 97-121 months | Time served |
| Moulder, Barbara | Telemarketer | 63-78 months | Time served |
| Moulder, Rhonda | Manager | 188-235 months | 6 months |
| Patteson, Lucille | Owner | 51-63 months | 9 months |
| Prince, Jessica | Manager | 108-135 months | Time served |
| Saindon, Kiley | Manager | 78-97 months | Time served |
| Schlusser, Caitlin | Manager | 51-63 months | Time served |
| Smoliak, Jeffrey | Telemarketer | 168-210 months | Time served[5] |

As previously stated, the Government's pretrial plea agreement offer to Dudley was a recommended sentence of time served, compared to a guideline sentencing range of 151-

---

[2] The sentencing range reported here is derived from plea agreements and sentencing position statements on file.

[3] Creason, initially sentenced to 12 months and a day, was resentenced in April 2024 after providing post-conviction assistance to the Government.

[4] At the time of his June 2023 sentencing, McGarrity had been in custody for more than 21 months after traveling to Mexico in violation of his pretrial release conditions.

[5] Smoliak, initially sentenced to 6 months, was resentenced in June 2023 after providing post-conviction assistance to the Government.

4854-5760-5063.1

188 months.  A time served disposition is consistent with the sentences outlined above, and especially so as Dudley's role as a telemarketer was less consequential than the call center managers who have received time served sentences.

Additionally, it would be contrary to the Sentencing Guideline's purpose of "just punishment" to hold Dudley accountable in ways that many of his colleagues were not, simply because the Government decided not to indict similarly situated coconspirators. (*See* USSG Chapter 1, Part A (1)(2) (outlining purposes of Sentencing Reform Act of 1984).)  For this reason, the Court should also give weight to the difficult circumstance that Dudley is being held accountable for, conduct for which many others are not, simply because of the exercise of prosecutorial discretion in this case.  During the relevant time period, Michelizzi employed more than 350 people at his Minnesota-based magazine companies, the vast majority of them telemarketers.  Of those, only Dudley, Landsem, and McGarrity[6] were charged.  Several arguably more serious offenders were given a pass—despite the fact that they had comparable or more significant roles and their conduct was well documented—simply because they did not have the misfortune of staffing the auto

---

[6] McGarrity effectively received a sentence of about 21 months in custody, which may have been justified since his conduct was more serious than that attributed to Dudley. McGarrity's ties to the fraudulent magazine scheme went much deeper as he worked in the industry for 15 years at seven or eight different companies. (Tr. Vol. V at 812 - 813.) He previously worked with several co-defendants at those companies, including Tony Moulder (*id.* at 815); Michelizzi and Wayne Dahl (*id.* at 817); Rhonda Moulder (*id.* at 818 - 819); Jeff Smoliak, Stacy Persons, and Eric Esherick (*id.* at 825); and Monica and Tim Hanssen (*id.* at 841).  Moreover, McGarrity previously owned his own fraudulent magazine business at one time called Universal Readers.  (*Id.* at 844).  And, of course, he was disadvantaged at sentencing by his disappearance to Mexico in violation of his conditions of release.  McGarrity therefore does not compare favorably to Dudley for sentencing purposes.

dial system when the undercover agent was called.[7]  This basis for drawing the line has

been confirmed by counsel for the Government.   (*See, e.g.*, Alexander Sentencing,

ECF 270 at 12.)  As Postal Inspector Western testified at trial:

> Q.  The only reason Mr. Dudley is here and that Mr. McGarrity and
>      Mr. Landsem were charged is because they were recorded talking
>      to undercover agents; is that right?
>
> A.  That's right.
>
> Q.  And that's why Mr. Leinum and Ms. West are not here today or
>      were not charged in the indictment?
>
> A.  There was charging decisions made, and that may have factored
>      into it.

(Tr. Vol. VIII at 1743.)  Of course, at this stage, the Government's charging decisions are

"water under the bridge," but they nonetheless provide helpful context in evaluating the

fairness of a defendant's sentence compared to others similarly situated.

> **I.      The need to provide restitution to any victims of the offense (3553(a)(7)).**

As with the Government's loss calculation, the restitution obligation attributed to

Dudley is overstated.  As Dudley urges in his objection and motion for departure, and as

acknowledged in the PSR, the loss attributed to Dudley may be far less and closer to the

restitution amounts provided for in the plea agreements of similarly-situated co-defendants

---

[7] They include Gene Leinum who had worked in the magazine industry for over 50 years at multiple companies, Kimberly West who had worked in the industry for several years at multiple companies and was recorded talking to an undercover agent, Daniel Kallhof who was involved in over 19,200 sales, his wife Sheila Nord Kallhof, Dana Musgrove, Nick Radcliff, Tim Hall, Montrell Pouncy, officer manager Tanesha Hatley, office manager Tammy Moreno, and collections employee Eddie Epps who had worked for Wayne Dahl before he was employed by Michelizzi.  (Tr. Vol. VIII at 1740-1749; *see also* Trial Exhs. Dudley-011 through 018 and Dudley 021.)

who were telemarketers.  *See* PSR at ¶217.  West Side co-defendants Landsem and McGarrity signed plea agreements providing for restitution amounts of $15,000 and $100,000 respectively.  Dudley has no financial assets and is not currently capable of paying a criminal monetary obligation.  (*See* PSR at ¶¶197-200.)  Even a six-figure restitution payment would certainly be impracticable.  Accordingly, Dudley urges a restitution payment at the lower end of the range, and notes that a variance from any term of imprisonment would facilitate his ability to pay restitution.

## IV.     A FAIR AND REASONABLE SENTENCE

Consideration of the 3553(b) factors strongly favors a time served sentence for Dudley as a fair and reasonable outcome:

- o   A time served sentence is consistent with the sentences received by other telemarketers charged in the case.  More importantly, it is most consistent with the Government's plea offer immediately before Dudley's trial.

- o   A time served sentence conforms with Dudley's minimal role in the fraudulent enterprise and his relative lack of significant responsibility for it.

- o   A time served sentence achieves the objectives of deterrence and protection of the public.  The Government conceded that its main objectives have been achieved with the shutdown of the magazine companies and the prosecution of their principals.  Prior to this action, Dudley had never engaged in any financial misconduct, and he poses no threat of harm.

- o   A time served sentence provides the most flexibility to support Dudley's rehabilitation by preserving his freedom to take advantage of treatment and

counseling programs, economic development and employment opportunities, and group support and networking.

The Government will likely resist leniency toward Dudley contending that he put the Government to its burden of proof at trial, testified in his defense, and otherwise failed to accept responsibility for his conduct. First, the Court should not punish a defendant for exercising his right to receive a full and fair trial, and it retains the discretion to acknowledge acceptance of responsibility even if a defendant chooses to go to trial. *See* USSG §3E1.1, comment 2; *United States v. Wilcox*, 487 F.3d 1163, 1175-76 (8th Cir. 2007). Secondly, the Court should not enhance the sentence "simply because a defendant testifies on his own behalf and the jury disbelieves him." *United States v. Garcia*, 61 F.4th 628, 631 (8th Cir. 2023); *see United States v. Dunnigan*, 507 U.S. 87, 95 (1993) (noting that a jury may find a defendant's *truthful* testimony insufficient to prove lack of intent). Finally, as noted *supra*, Dudley has expressed his remorse at trial, acknowledging the financial hardship and pain caused by his conduct, and repeated his acceptance of responsibility as part of the presentence investigation.

## CONCLUSION

For the foregoing reasons, the Court should grant Dudley's motions for departure and variance, and impose a sentence of time served accompanied by reasonable conditions for supervised release.

Dated:  June 17, 2024                    Respectfully submitted,


                                         */s/  Donald M. Lewis*
                                         Donald M. Lewis, Reg. No. 62844
                                         Kathleen K. Curtis, Reg. No. 0388279
                                         NILAN JOHNSON LEWIS PA
                                         250 Marquette Avenue South, Suite 800
                                         Minneapolis, MN 55401
                                         Telephone: (612) 305-7500
                                         Fax: (612) 305-7501
                                         Email: DML325Rondo@gmail.com
                                                   kcurtis@nilanjohnson.com

                                         **Attorneys for Defendant**
                                         **Ballam Hezeakiah Dudley**

4854-5760-5063.1