UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-232(35) (JRT/DTS)

UNITED STATES OF AMERICA,

      Plaintiff,

v.

BALLAM HAZEAKIAH DUDLEY,

      Defendant.

**GOVERNMENT'S SENTENCING MEMORANDUM**

For the following reasons, the United States recommends that Defendant Ballam Dudley receive a sentence of 36 months imprisonment. The United States believes that such a sentence, which is a downward variance below the low end of the applicable Guidelines range, is sufficient, but not greater than necessary, to comport with the Section 3553(a)(2) sentencing factors.

## I.    Relevant Facts

### A. Offense Conduct

On October 20, 2020, Dudley was charged in a 53-count indictment with conspiracy to commit mail fraud, wire fraud, and mail fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1349. Following a three-and-a-half-week trial, Dudley was convicted on November 6, 2023 of multiple counts, include one count of conspiracy to commit mail fraud and individual counts of mail and wire fraud.

The evidence introduced at trial showed that Dudley participated in a large, nationwide telemarketing fraud scheme involving magazine subscription sales. During various periods between 2010 and 2020, Dudley worked as a telemarketer for

several Minnesota-based companies involved in fraudulent magazine sales. Those companies were owned and operated by co-defendant Jared Michelizzi and including Central Subscription Service, West Side Readerz, Magazine Service Center, and Subscribers Service Center. These various companies, although separate in name, essentially operated as a single company for the purposes of perpetuating the fraud scheme.

Dudley and others he worked with perpetuated a conspiracy to defraud victims across the country, many of whom were older or otherwise susceptible to fraud. Dudley and his co-conspirators fraudulently induced consumers into making payments related to purported magazine subscriptions. The fraud scheme worked like this: Telemarketers like Dudley called lists of consumers and made a series of lies and misrepresentations, including that the telemarketer was calling from the consumer's existing magazine company and was calling in order to reduce the monthly payments for an existing magazine subscription. But in reality, the company had no existing relationship with the consumer and tricked the consumer into paying for an expensive, new magazine subscription that they did not want or understand they were ordering.  Telemarketers like Dudley would repeatedly lie to consumers on the phone, telling them they would save them money or make the incessant  and predatory telemarketing calls stop by placing them on a "no call" list (that did not actually existed). Many of the consumers called by telemarketers like Dudley had numerous magazine subscriptions with Michelizzi's various companies. Some

2

consumers were being billed by over a dozen different magazine companies and were billed tens of thousands of dollars for magazine subscriptions they did not want.

Dudley worked as a telemarketer for Michelizzi's Minnesota-based companies. In that role, he used fraudulent sales scripts, which were provided by the company, to call victims and make a series of deliberate lies and misrepresentations about how the company could lower the monthly cost of a subscription or renew a subscription that the victim was receiving at a lower cost. This was not true, and Dudley and the company charged the victim for a subscription that they did not want. Although Dudley was provided and used sales scripts, according to testimony at trial he also used his own variations of the sales pitch or script—other lies and misrepresentations—that he believed would be more effective. As Dudley became more experience, he eventually moved into the role of a closer. As a closer, Dudley had additional responsibility for engaging with consumers and billing them for subscriptions they did not want and did not understand they were signing up for.

In the course of the scheme, Dudley and the companies he worked for defrauded thousands of victims and collected over $7 million from victims as a result of the fraudulent scheme.

### B. Defendant's Criminal History

Dudley has numerous criminal convictions; however the majority of his criminal history points are comprised of minor drug offenses or other low level criminal activity like driving while intoxicated. Notably, Dudley has three prior drug convictions: a conviction for fifth degree possession of marijuana in 2006, possession

with intent to deliver marijuana in 2008, and third degree drug sale for possession of cocaine in 2013.

Although Dudley undoubtably has a very significant criminal history (both in terms of criminal history score and the number of convictions), they primarily are low level drug crimes that appear to stem from a long history of drug addiction and abuse.

In total, Dudley has a criminal history score of 12, corresponding to a criminal history category of V.

### C. Defendant's Personal History

In many ways, Dudley had a normal and stable upbringing. His father was a veterinarian and his mother was a flight attendant and decorator. Although his parents divorced when he was a teenager, he was always well provided for and supported. He grew up in the suburbs of Minneapolis, had friends in his neighborhood, graduated high school, and attended some college. Nothing about his upbringing particularly suggests that he would end up participating in a fraud scheme.

## II. Argument

### A. Legal Background

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[U]nder the advisory guidelines scheme, sentencing judges are required to find sentence-enhancing facts only by a preponderance of the evidence." *United States v. Scott*, 448 F.3d 1040, 1043 (8th Cir. 2006).

"[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50; 18 U.S.C. § 3553(a). The Section 3553(a) factors include "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

### B.     The Presentence Investigation and Guidelines Calculations

The United States has reviewed the PSR prepared by the U.S. Probation Office. The United States did not object to the PSR. The PSR concluded that the total offense level is 29, and the criminal history category is V. Based on this, the Guidelines range term of imprisonment is 140 to 175 months. (PSR ¶ 202.)

### C.     The Appropriate Sentence

A careful consideration of the Section 3553(a) factors warrants a sentence of time served.

####         1.     The Nature and Circumstances of the Offense.

Dudley's conduct was unquestionably serious and warrants a correspondingly serious sentence. He participated in a large, nationwide fraud scheme that targeted thousands of elderly and otherwise vulnerable victims. Although he knew that he and others at the company were committing fraud, he continued to work there day in and day out and perpetrated the scheme for years.

At the same time, Dudley played only a small part in a large-scale fraud. In many ways, Dudley did not seek out a career in telemarketing or fraud. He was drawn to the magazine industry because it was a job he was able to get with his criminal history. And he found success in the job because he was good on the phones. He worked as a telemarketer and did not own or operate any of the companies where he worked. He did not develop the fraud scheme. Nor did he get rich participating in the scheme—he was only paid a small wage for his work.

    2.    <u>The History and Characteristics of the Defendant.</u>

There is nothing particularly in Dudley personal history that suggested he would end up convicted of participating in a large-scale telemarketing fraud scheme. He had many opportunities. His parents encouraged his education and he graduated from high school and attended some college. In many respects, Dudley had an array of career opportunities that he could have pursued and succeed in. Many of his opportunities were derailed when he was convicted of his first felony drug offense, which limited his career options going forward. Of course, Dudley could have pursued different telemarketing opportunities, which would have put his skills as a salesman to work in a non-fraudulent industry. But he did not, and instead repeatedly returned to the magazine sales industry.

    3.    <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Afford Adequate Deterrence</u>

In light of the seriousness and wide-spread nature of the offense, Dudley requires a sentence that will not only prevent him from committing another offense in the future but will also provide general deterrence for others who operated similar

6

fraudulent schemes brazenly throughout the country for decades. Dudley and others who participate or consider participating in a similar scheme are more likely to be deterred from committing fraud if they learn there are serious consequences, and they will pay a stiff price for it. A significant sentence will promote respect for the law and reflect the damage to victims and the community as a whole as a result of a large-scale fraud scheme that preyed on elderly and otherwise vulnerable victims. At the same time, Dudley has already dealt with the significant consequences and effects of a felony conviction. And Dudley appears to have used his time of pre-trial supervision to effect positive changes in his life.

On the other side, Dudley proceeded to trial, where he took the stand and perjured himself in his own defense. At trial, Dudley repeatedly testified that he merely "verified" sales, that he did not actually partake in any sales, and that he was unaware that anyone at the various companies he worked for was committing fraud, day in and day out, over a nearly decade long period. This is significant in the government's position on sentencing, and had Dudley not taken the stand and offered perjured testimony, the government would have sought a sentence of 24 months imprisonment.

A sentence of 36 months imprisonment will serve the needs of sentencing to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, and to protect the public from further similar fraud schemes.

### III. Conclusion

For all the above reasons, the United States respectfully requests that the Court vary downward and impose a sentence of 36 months of imprisonment.

Respectfully submitted,

Dated: June 26, 2024

ANDREW M. LUGER
United States Attorney

/s/ *Harry M. Jacobs*

BY:   HARRY M. JACOBS
MATTHEW S. EBERT
MELINDA A. WILLIAMS
GARRETT S. FIELDS
Assistant U.S. Attorneys